# THE MAIL DIVISOR CASES.[1]

## APPEALS FROM THE COURT OF CLAIMS.

Nos. 109, 132, 133, 232. Argued December 17, 18, 19, 1919.—Decided January 12, 1920.

The Act of March 3, 1873, c. 231, 17 Stat. 558, in appropriating "for increase of compensation for the transportation of mails on railroad routes," directed the Postmaster General to readjust such compensation thereafter to be paid "upon the conditions and at the rates hereinafter mentioned," thereupon providing that the pay per mile per annum "shall not exceed" certain specified sums graded according to average weights of mails carried per day, and further that "the average weight . . . be ascertained, in every case, by the actual weighing of the mails for such a number of successive working-days, not less than thirty [by Act of March 3, 1905, c. 1480, 33 Stat. 1082, 1088, increased to ninety], at such times . . . not less frequently than once in every four years, and the result . . . be stated and verified in such form and manner, as the Postmaster-General may direct."

*Held:* (1) The rates specified are the *maxima;* and the act leaves it discretionary with the Postmaster General, to fix lower rates in contracting with railroads. Holmes, J., p. 329; Pitney, J., p. 335.

(2) The aim of the weighing provision is to obtain the daily average for the year; the "working-days" and the weighing-days (whether including Sundays or not,) are identical; and inasmuch as the mileage of seven-day routes now greatly exceeds that of six-day routes, the Postmaster General, in the exercise of his discretion over rates, may adopt a general rule, to use in all cases the whole number of days of the weighing period, Sundays included, as a divisor for obtaining the average weight, instead of omitting Sundays from the

[1] The docket titles of these cases are: *Northern Pacific Railway Company* v. *United States,* No. 109; *Seaboard Air Line Railway* v. *United States,* No. 132; *New York Central & Hudson River Railroad Company* v. *United States,* No. 133; and *Kansas City, Mexico and Orient Railway Company of Texas* v. *United States,* No. 232.

divisor as was done when the six-day routes predominated. Holmes, J., p. 331.

The statute prescribes that the aggregate weight for the weighing period shall be divided by the number of "working-days"—meaning week-days—included in the period; but this is directory only, so that a failure of the Postmaster General to follow this method strictly in fixing rates will not render his action void. Pitney, J., pp. 335–337.

The provision of the Act of July 12, 1876, c. 179, 19 Stat. 79, reducing the compensation "ten per centum per annum from the rates fixed and allowed," and the similar provision of the Act of March 2, 1907, c. 2513, 34 Stat. 1212, refer to the statutory maximum rates, and did not impair the discretion of the Postmaster General to fix lower rates. Holmes, J., pp. 330, 333; Pitney, J., p. 338.

So also of the like provision in the Act of June 17, 1878, c. 259, 20 Stat. 142. Pitney, J., p. 338.

The former practice of the Postmaster General of allowing the railroads the full statutory rates and average weights derived through a divisor excluding Sundays, was an exercise of his discretion in determining the pay, and not an interpretation of the statutes as requiring that the pay be so determined. Holmes, J., p. 332.

Rejection by Congress of amendments requiring the divisor to be the number of weighing days is not an interpretation of the existing law as forbidding that method. Holmes, J., p. 333.

Prior to the Act of July 28, 1916, c. 261, 39 Stat. 429, railroad companies which had not been aided by grants, or otherwise, were free to refuse to carry the mails at rates offered. Pitney, J., p. 339.

Railroad companies which receive and transport the mails and accept the compensation with knowledge that it is readjusted under a rule insisted upon by the Postmaster General, whereby the whole number of days in the weighing period, including Sundays, is used as a divisor in obtaining the average weights, cannot afterwards repudiate their contracts and claim a larger compensation because the week-day divisor was not employed, as directed by the statute. Pitney, J., p. 339.

The same considerations apply to land-grant railroads, under duty to carry the mail at the prices fixed by law, and which by statute are to receive a certain percentage of the pay authorized in other cases; it not appearing that the Postmaster General acted arbitrarily or discriminated against them, or fixed the pay at non-compensatory amounts. Pitney, J., p. 340.

53 Ct. Clms. 258, affirmed.

The cases are stated in the opinions.

*Mr. Alexander Britton,* with whom *Mr. C. W. Bunn* and *Mr. Evans Browne* were on the brief, for appellant in No. 109.

*Mr. Benjamin Carter,* with whom *Mr. James F. Wright* was on the brief, for appellant in No. 132.

*Mr. Frederic D. McKenney,* with whom *Mr. John Spalding Flannery* was on the brief, for appellant in No. 133.

*Mr. F. Carter Pope* for appellant in No. 232.

*The Solicitor General* and *Mr. La Rue Brown,* Special Assistant to the Attorney General, with whom *Mr. Joseph Stewart,* Special Assistant to the Attorney General, was on the briefs, for the United States.

*Mr. William R. Harr* and *Mr. Charles H. Bates,* by leave of court, filed a brief as *amici curiæ,* in No. 109.

*Mr. Abram R. Serven* and *Mr. Burt E. Barlow,* by leave of court, filed a brief as *amici curiæ,* in No. 109.

*Mr. L. T. Michener,* by leave of court, filed a brief as *amicus curiæ,* in No. 132.

*Mr. R. Stuart Knapp,* by leave of court, filed a brief as *amicus curiæ,* in No. 132.

Mr. Justice Holmes announced the judgment of the court and delivered the following opinion, concurred in by the Chief Justice and Justices Brandeis and Clarke.

These are claims for compensation for carrying the mails above the amounts allowed and paid by the Postmaster General. The four cases are independent of one another,

but as the claims all depend for their validity upon a denial of the Postmaster General's power to pass a certain order they may be considered together. They were rejected by the Court of Claims. The question shortly stated is this. The pay for carrying the mails is determined by the average weight carried. To ascertain this average the mails are weighed for a certain number of consecutive days, and for some time before 1907 the total weight was divided by the number of working days—if the number of days was thirty-five it was divided by thirty, if one hundred and five by ninety. But on June 7, 1907, the Postmaster General issued an order, No. 412, "that when the weight of mail is taken on railroad routes the whole number of days included in the weighing period shall be used as a divisor for obtaining the average weight per day." This of course diminishes the average weight and therefore the pay of the railroads. They deny the authority of the Postmaster General to make the change and sue for the additional sum that under the old practice they would have received.

The texts to be discussed begin with an Act of 1873, but it should be observed as furnishing a background for that and the following statutes that from the beginning of the Government the Postmaster General, as the head of a great business enterprise, always has been entrusted, as he must be, with a wide discretion concerning what contracts he should make, with whom and upon what terms. It is needless to go into the early statutes or to do more than to refer to Rev. Stats., § 3999, which authorizes him to make other arrangements if he cannot contract for the carriage of the mail upon a railway route at a compensation not exceeding the maximum rates then established, or for what he deems reasonable and fair. The limitations upon the power were in the interest of the business, the principal one being that the pay per mile per annum should not exceed certain rates. Act of June 8, 1872, c. 335, § 211,

17 Stat. 283, 309; Rev. Stats., §§ 3998, 4002. The language plainly showed and the decisions have established that the Postmaster General, if it seemed to him reasonable, could refuse to pay the maximum and insist upon some lesser rate as a condition of dealing with a road. *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 225 U. S. 640, 649.

The Act of March 3, 1873, c. 231, 17 Stat. 556, 558, appropriates five hundred thousand dollars, or so much thereof as may be necessary, "for increase of compensation for the transportation of mails on railroad routes upon the condition and at the rates hereinafter mentioned." Then, after providing for due frequency and speed and suitable accommodations for route agents— matters on which obviously the Postmaster General is the person to be satisfied—it enacts that "the pay per mile per annum shall not exceed the following rates, namely: On routes carrying their whole length an average weight of mails per day of two hundred pounds, fifty dollars; five hundred pounds, seventy-five dollars," &c., &c. So far it will be seen that although the object is to permit an increase of compensation still the discretion of the Postmaster General under the earlier acts remains and that he could decline to pay the maximum rates, however ascertained, or any sum greater that he should deem reasonable. It is argued, to be sure, that the rates were fixed at the maximum, and the Act of July 12, 1876, c. 179, 19 Stat. 78, 79, reducing the compensation "ten per centum per annum from the rates fixed and allowed" is thought to help the conclusion. But no argument can obscure the meaning of the words "shall not exceed." The rates were fixed and reduced in their maxima but that was all that was done with regard to them. *United States* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 249 U. S. 451, 454. The question is whether for any reason the control over the compensation thus undeniably given to him

without imposing any downward limit as to the money rates, is wholly withdrawn from his judgment in the preliminary stage of determining the basis to which the money rates are to be applied.

The next words of the statute are: "The average weight to be ascertained, in every case, by the actual weighing of the mails for such a number of successive working-days, not less than thirty, at such times" &c., "and the result to be stated and verified in such form and manner, as the Postmaster-General may direct." The pay it will be remembered was to be per mile per annum, and as it was not practicable to weigh all the mails throughout the year and so to find out the total actual weight of the mails and the exact number of miles that they were carried in the year, the result had to be arrived at approximately by finding the average weight carried on days assumed to resemble the other days of the 365. The average to be reached was not an average for the thirty days but an average weight per day for the year. This interpretation is shown to be the understanding of Congress by the Act of July 12, 1876, c. 179, 19 Stat. 78, 79, which reduces the compensation ten per centum per annum from the rates fixed and allowed by the Act of 1873 "for the transportation of mails on the basis of the average weight." This must mean the average weight for the year concerned. Again by the Act of March 3, 1905, c. 1480, 33 Stat. 1082, 1088, "the average weight [i. e., of course, the average weight for the year] shall be ascertained by the actual weighing of the mails for such a number of successive working days not less than ninety" &c., the increase in the number of days manifestly being for the purpose of more nearly hitting the average for the whole time. The statutes do not mention the divisor to be used in order to get the average desired. In 1873 mails were not carried on Sundays except over a comparatively small proportion of routes and therefore six was the fairest single divisor.

Now, on the other hand, it is said that the mileage of the seven-day routes is much greater than that of the six days. Therefore now to weigh for Sundays as well as other days and to divide by seven, is the fairest single rule that can be found.

But it is said that when an average is directed to be reached by weighing for say thirty working days it is implied that you are to get the average by using the number of working days on which the mails were weighed as a divisor, that working days mean week days, and that if in fact Sundays are used as working days, the divisor is not affected because the statute only contemplated six for a week. But the supposed implication of the statute disappears when it is remembered that the average wanted is not the average for the weighing days only but the average for the year. It is plain too that, whether " working-days " be read to mean week days or the days on which work was done in fact, the statute contemplates the working days and the weighing days as identical and therefore affords no ground for demanding the advantage of a dividend of seven and a divisor of six, which is what the railroads want.

Various make-weights are thrown in to help the construction desired by the roads but they seem to us insufficient to change the result that is reached by reading the words. It is said that down to 1907 the Post Office Department construed the Acts of 1873 and after as entitling the railroads to the maximum rates for full service as defined and to the minimum divisors and that this construction must be taken to have been adopted in silence, by the later statutes. But the exercise of power in the way deemed just while the conditions stated to have existed in and after 1873 continued was not a construction but the exercise of discretion in determining the amount of pay—a discretion which, as we have seen, undeniably was given in the form of a right to regulate

rates, and which therefore there could be no reason for withholding, beyond the express words of the act, at the other end. It is true that in 1884 an Assistant Attorney General gave an opinion that any departure from the practice would defeat the intention of the law and cause no little embarrassment and that thereafter an order made by a previous Postmaster General for taking the number of weighing days as the divisor was revoked. But the letter of the Postmaster General thus answered merely stated what had been the practice as to the divisor and asked whether it was in violation of law. It did not state that the Post Office considered itself bound to follow that way. The order that was revoked only purported to affect seven-day routes and is of little or no importance to the question before us now.

It is said that the rate was fixed by the Act of March 2, 1907, c. 2513, 34 Stat. 1205, 1212, if not before, by a reduction to "five per centum less than the present rates" on certain routes. But as we have stated we understand this to mean a reduction of the rates fixed by statute, that is the maximum rates. We do not understand it to refer to rates specifically allowed. It is not likely that Congress considered the latter in detail.

Finally much is made of the fact that before the passage of the Act of March 3, 1905, and again before the passage of the Act of March 2, 1907, provisos were stricken out that in effect required the divisor to be the number of the weighing days. A similar thing happened before the passage of the act making appropriations for the fiscal year ending June 30, 1909. We do not go into the particulars of these matters because whatever may have been said by individuals the provisos might as well have been rejected for the purpose of leaving the choice between the two divisors to the judgment of the Postmaster General as for any other reason. On the other hand we are not disposed to lay much stress on the fact

that the appropriations by Congress accepted the Post-
master General's estimates even when it had been notified
that the railroads were dissatisfied with Order No. 412.
The Act of March 3, 1875, c. 128, 18 Stat. 340, 341,
ordered the Postmaster General to have the weighing
done thereafter by the employees of the Post Office De-
partment, and to "have the weights stated and verified
to him by said employees under such instructions as he
may consider just to the Post-Office Department and the
railroad-companies." Possibly this might be construed
to recognize the power now in dispute but this suggestion
also we are content to leave on one side. We also leave
unconsidered the great difficulties that the railroads
encounter in the effort to show that their conduct did not
amount to an acceptance of the Postmaster General's
terms within the decision in *New York, New Haven &
Hartford R. R. Co.* v. *United States, ante,* 123. The con-
struction of the statutes disposes of all the cases without
the need of going into further details.

*Judgments affirmed.*

MR. JUSTICE DAY and MR. JUSTICE VAN DEVANTER
dissent. MR. JUSTICE McREYNOLDS took no part in the
decision of the cases.

MR. JUSTICE PITNEY, with whom concurred MR.
JUSTICE McKENNA.

I concur in the affirmance of the judgments of the
Court of Claims in these cases, but upon grounds some-
what different from those expressed in the opinion of
Mr. Justice Holmes.

All the claims arose under the law as it stood after
the Act of March 2, 1907, c. 2513, 34 Stat. 1205, 1212, and
before that of July 28, 1916, c. 261, 39 Stat. 412, 429,
by which the carriage of mail matter by the railways
was made compulsory. The act about which the prin-

cipal controversy turns is that of March 3, 1873, c. 231, 17 Stat. 556, 558, the disputed portion of which was carried into § 4002, Rev. Stats. By it the Postmaster General was "authorized and directed to readjust the compensation hereafter to be paid for the transportation of mails on railroad-routes upon the conditions and at the rates hereinafter mentioned: . . . Second, That the-pay per mile per annum shall not exceed the following rates, namely: On routes carrying their whole length an average weight of mails per day of two hundred pounds, fifty dollars; . . . five thousand pounds, two hundred dollars, and twenty-five dollars additional for every additional two thousand pounds, the average weight to be ascertained, in every case, by the actual weighing of the mails for such a number of successive working-days, not less than thirty, at such times . . . and not less frequently than once in every four years, and the result to be stated and verified in such form and manner, as the Postmaster-General may direct."

In my opinion, the rates of pay per mile per annum were maximum rates, and the Postmaster-General had a discretion to contract at less if the railroads agreed; but under § 210 of the Act of June 8, 1872, c. 335, 17 Stat. 283, 309; Rev. Stats., § 3997, he was under a duty to arrange the routes into classes according to the size of the mail, and the speed, frequency, and importance of the service, "so that each railway company shall receive, as far as practicable, a proportionate and just rate of compensation, according to the service performed."

But I think that in the clause "the average weight to be ascertained, in every case, by the actual weighing of the mails for such a number of successive working-days, not less than thirty," etc., the words "*successive working-days*," by proper interpretation, mean successive week days; and since the aggregate weight for the weighing period must be subjected to division in order to ascertain the

average weight per day, it naturally follows that the
divisor should be the same number of "working-days"
(that is, week days) that are included in the period. The
previous history of the mail service shows abundant
reason for this, and for more than thirty years thereafter
the provision was uniformly so construed by the Depart-
ment. Upon a large number of the railway routes, mails
were carried six days each week, none being carried on
Sunday; while on other routes they were carried on every
day in the week. The aggregate weight of mails carried
was not affected by the frequency of the service, since the
six-day routes carried the Sunday accumulations on Mon-
days. This explains why a certain number of "working-
days" (week days) was made the measure of the weighing
period, and at the same time shows that the week-day
divisor was necessary in order to deal equitably with both
the six-day and the seven-day routes. From the passage of
the Act of 1873 down to the promulgation of Order No.
412 in the year 1907, the practice of the Department was
in accord with the above interpretation. It was explained
in a communication from the Postmaster General to the
Senate January 21, 1885, Senate Ex. Doc. No. 40, 48th
Cong., 2d sess., p. 68: "The present rule is, on those roads
carrying the mails six times a week, to weigh the mails on
thirty consecutive days on which the mails are carried,
which would cover a period of thirty-five days; dividing
the aggregate thirty weighings by thirty will give the
daily average. On those roads carrying the mails seven
times per week the weighing is done for thirty-five con-
secutive days (including Sundays) and the aggregate
divided by thirty for a basis of pay. It is evident that the
period during which the weighing is continued covers, in
both cases, all the mails carried for thirty-five days. If,
in the second case, we should take our basis from an
average obtained by dividing the aggregate weight by
thirty-five we should commit the absurdity of putting a

premium upon inefficiency, for evidently if the Sunday
train were cut off we should virtually have the same mails
less frequently carried, and therefore with a higher daily
average, and therefore a higher pay basis than in the case
where the seventh train was run and the greater accom-
modation rendered. The present method gives no addi-
tional pay for the additional seventh train, but the other
method would cause a reduction on account of better
service, and practically would operate as a fine on all
those roads carrying the mails daily, including Sunday."

The Act of March 3, 1905, c. 1480, 33 Stat. 1082, 1088,
changed the minimum weighing period so as to require the
inclusion of at least ninety, instead of thirty, successive
working days, but made no other change. Under this
act one hundred and five calendar days necessarily were
included in the weighing period in order to take in ninety
successive working days. In my opinion, this act, like
that of 1873, by fair construction, required that the week-
day divisor be employed. And so it was officially con-
strued, until 1907.

But while I regard this method of determining the
average weight to have been prescribed, and not left to the
discretion of the Postmaster General, still I think the
statute in this respect was only directory, and not man-
datory. Considering the provision in its relation to the
context and subject-matter, it will be seen to be but an
aid to the making of fair contracts within the maximum
rates allowed, and an aid to the Postmaster General in
fixing the rate of compensation upon land-grant routes,
and in so arranging routes that each railway company
shall receive a proportionate and just rate of compensation
according to the service performed. Hence, it seems to
me that a failure strictly to comply with the prescribed
method of ascertaining the average weight did not of
itself render the action of the Postmaster General *ultra
vires* and void.

The principal controversy in the present cases is over his Order No. 412 (June 7, 1907), which provided "That when the weight of mail is taken on railroad routes the whole number of days included in the weighing period shall be used as a divisor for obtaining the average weight per day." While I regard it as embodying an erroneous view of the statute, this is not sufficient, in my opinion, to vitiate a contract voluntarily made by a railway mail carrier based upon a calculation of average weight made and known to have been made in conformity with the order. All the present claims originated after the promulgation of the order, and arose out of the carriage of mails under arrangements made with the Postmaster General after express notice of its provisions.

It is contended that although the Act of 1873 (Rev. Stats., § 4002), in providing that the pay per mile per annum should "not exceed" the specified rates, conferred upon the Postmaster General a discretion to pay less rates, this was modified by the language of the Act of July 12, 1876, c. 179, 19 Stat. 78, 79, which reduced the compensation ten per centum from "*the rates fixed and allowed* [by the Act of 1873] for the transportation of mails on the basis of the average weight"; by that of the Act of June 17, 1878, c. 259, 20 Stat. 140, 142, where, however, the expression is: "by reducing the compensation to all railroad companies for the transportation of mails five per centum per annum from the rates for the transportation of mails, *on the basis of the average weight fixed and allowed*," etc.; or by the provision of the Act of March 2, 1907, c. 2513, 34 Stat. 1205, 1212, readjusting compensation on railroad routes carrying an average weight per day exceeding five thousand pounds, "by making the following changes in the present rates per mile per annum for the transportation of mail on such routes, and *hereafter the rates on such routes shall be* as follows," etc. I am not convinced that these amendments, or any of them, had

the effect of impliedly repealing that part of the Act of 1873 (Rev. Stats., § 4002)—"shall not exceed," etc.—from which alone, in my view, the Postmaster General derived any serviceable discretion about readjusting the compensation.

Therefore, he still had liberty of action within the maximum rates prescribed. And the railroad companies, other than such as had been aided by grants of lands or otherwise, were free to carry the mails at rates offered, or refuse them, as they chose. *Eastern R. R. Co.* v. *United States,* 129 U. S. 391, 396; *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 225 U. S. 640, 650; *Delaware, Lackawanna & Western R. R. Co.* v. *United States,* 249 U. S. 385, 388; *New York, New Haven & Hartford R. R. Co.* v. *United States, ante,* 123.

Furthermore, by § 212 of the Act of June 8, 1872, c. 335, 17 Stat. 283, 309; Rev. Stats., § 3999, if, because of the refusal of the railway companies, the Postmaster General was unable to make contracts at a compensation "not exceeding the maximum rates," or for what he deemed a reasonable and fair compensation, he was at liberty to use other means of carriage.

From the findings of the Court of Claims it appears that in all of these cases there were express contracts; and I concur in the view of that court (53 Ct. Clms. 258, 308, 315, 318, 319) that the contracts arose not out of the Distance Circular, in which the Postmaster General specially called notice to Order No. 412, and to which some of the claimants responded with protests, more or less explicit, that they would not be bound by that order; but arose out of what subsequently happened. The Postmaster General in every case informed the protesting carriers that he would not enter into contract with any railroad company excepting it from the operation of any postal law or regulation. The mails were weighed and the average weight ascertained in accordance with Order No.

412, as all the claimants had been notified would be done; thereafter the Postmaster General, upon the basis of the weight thus ascertained, caused the maximum statutory rate to be calculated, issued orders naming certain amounts thus arrived at as the compensation for the service, and gave notice in proper form to the carriers specifying in terms the readjusted pay that would be allowed, "subject to future orders and to fines and deductions." Thereafter the carriers received and transported the mails as offered, periodically accepted compensation in accordance with the readjustment notices, and proceeded thus without further objection or protest until the end of the respective quadrennial periods. In short, although in some cases they declared they would not consent to the ascertainment of average weights on the basis of Order No. 412, they did not insist upon their objection in the face of the Postmaster General's declaration that he would not accede to it. Had they refused to carry the mails on the terms proposed, he might have exercised his discretion as to the rate of pay per mile, so that instead of agreeing to give them, as he did, the maximum pay based on the average weight ascertained under Order No. 412, he might have acceded to their contention by employing the week-day divisor, but have carried into effect his own view as to the amount that ought to be allowed by reducing the rate of pay per mile. Or, as already shown, he might have refused to make the contracts and have proceeded under § 3999.

I deem it clear, therefore, that the claimants in fact accepted the Postmaster General's offers as contained in the readjustment notices, by proceeding to perform the prescribed service in accordance therewith and accepting the compensation due to them therefor. And so the Court of Claims held (53 Ct. Clms. 258, 308, 313, 315, 318, 319).

Some of the routes of the Seaboard Air Line and of the Northern Pacific Railway Company were over lines that had been aided by government land grants, and hence

were subject to provisions of law summed up in § 214 of the Act of June 8, 1872; Rev. Stats., § 4001, by which they were obliged to "carry the mail at such prices as Congress may by law provide; and, until such price is fixed by law, the Postmaster-General may fix the rate of compensation." The Seaboard Air Line makes no point of this; but in behalf of the Northern Pacific it is contended that claimant, not being in the position of a free agent, ought not to be regarded as having voluntarily accepted the terms proposed by the Postmaster General. But the effect of the findings is that it did so accept; and this result can not be overturned by raising an argument about the circumstances that went to make up the evidence upon which the findings were based; and the present contention amounts to no more than this.

Were it otherwise, nevertheless it appears that Congress had not provided the compensation for the land-grant routes, except that it had authorized and directed the Postmaster General to readjust all railway mail pay in the manner set forth in § 4002 and within the maxima prescribed therein and in the amendatory Acts of 1876, 1878 and 1907, above mentioned, and had provided by § 13 of the Act of July 12, 1876, c. 179, 19 Stat. 78, 82, "That rail-road-companies whose railroad was constructed in whole or in part by a land-grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct shall receive only eighty per centum of the compensation authorized by this act," besides other legislation concerning the land-grant routes that may be referred to but need not be recited. Acts of March 2, 1907, c. 2513, 34 Stat. 1205, 1212; May 12, 1910, c. 230, 36 Stat. 355, 362; July 28, 1916, c. 261, 39 Stat. 412, 426. Assuming, therefore, that there was no contract affecting the land-grant lines of the Northern Pacific, their compensation must be at the rate fixed by the Postmaster General in the exercise

of the power and discretion conferred upon him by this
legislation; and so long as he exercised this power and
discretion reasonably, not fixing a non-compensatory rate
or otherwise acting arbitrarily, the carrier was concluded
by his action.   There is no finding that he acted arbi-
trarily; on the contrary, he had in support of Order No.
412 a considered opinion of the Attorney General under
date September 27, 1907 (26 Ops. Atty. Gen. 390); and,
so far as appears, he treated the land-grant routes like
others, not reducing them below the eighty per centum
contemplated by § 13 of the Act of 1876, or otherwise
violating the statutes.   There is no finding nor any conten-
tion that the amounts allowed them were not compensa-
tory; and, upon the whole, it seems to me that although
he erred in failing to apply the week-day divisor to the
weighings, this did not render the readjustment based
thereon wholly void, or permit the carrier, after trans-
porting the mails and accepting the stated compensation
without further objection, afterwards to treat the read-
justment orders as nullities.

MR. JUSTICE McKENNA concurs in this opinion.