Mardell HEARNS, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF CONSUMER & REGULA-
TORY AFFAIRS, Respondent.

No. 96–AA–750.

District of Columbia Court of Appeals.

Submitted Sept. 23, 1997.
Decided Oct. 30, 1997.

William B. Cox for petitioner.

Jo Anne Robinson, Acting Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, for respondent.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

PER CURIAM.

Petitioner Hearns appeals from a decision of the District of Columbia Department of Consumer and Regulatory Affairs (DCRA), in which it ordered that petitioner's name be placed in the Abuse Section of the Nurse Aide Registry, pursuant to 29 DCMR §§ 3251.1 and 3251.2 (1991). She asserts that the decision is not in accordance with the law and is unsupported by substantial evidence in the record. We affirm.

I.

Petitioner was employed as a Certified Nursing Assistant at the Grant Park Care Center. An administrator (and former executive director) at the center filed a complaint-incident report with the District of Columbia Service Facility Regulation Administration (SFRA). According to the report, the administrator, Barbara Nash, observed petitioner pull a resident, Laura Jordan, by the arm from the corridor into Ms. Jordan's room and shake her finger in Ms. Jordan's face in a reprimanding manner. When questioned about this behavior by the administrator, petitioner stated that she meant no harm but that "[t]his is my way." On her employee counseling form, petitioner admitted to physically pulling Ms. Jordan by the arm but denied intending to abuse her.

An extensive investigation of the reported incident of abuse was conducted by Nancy Lee, Nurse Consultant to the DCRA. Her

report included information that, while Ms. Jordan could "be difficult to handle" and had "periods of inappropriate outbursts," she "was usually easily directed." Nurse Lee's investigation concluded that the allegations of abuse were substantiated.

The DCRA issued a Notice of Proposed Action to list petitioner's name in the Abuse Section of the Nurse Aide Registry, in accordance with 29 DCMR §§ 3252.6, 3252.7 (1991). Petitioner requested a hearing which was held before an Attorney Examiner in the Office of Adjudication, DCRA. Petitioner has provided us with no transcript of the hearing. According to the decision and order of the examiner, however, petitioner in her testimony denied abusing Ms. Jordan but admitted that she shook her finger in her face and firmly held her by the wrist. Testimony by Barbara Nash, credited by the examiner, "was to the effect that she personally observed [petitioner] talking roughly to the resident, immediately followed by [petitioner] grabbing the resident's arm and dragging her to her room from a hallway location, while shaking her finger in the resident's face." According to Nash, petitioner had attended regularly scheduled staff training sessions concerning "appropriate staff behavior in the face of difficult situations," and her behavior at the time in question was "highly inappropriate" under the facility's policies.

Following the hearing, the Attorney Examiner issued a decision and order and concluded that petitioner had committed an act of violence against a nursing home resident in violation of 42 CFR § 483.13 (1996). Accordingly, the Examiner ordered that petitioner's name be placed on the Abuse Section of the Nurse Aide Registry maintained by DCRA.

## II.

 Our review here is limited to determining whether the agency made findings of fact supported by sufficient evidence and made a decision which rationally follows from the facts. *Citizens Ass'n of Georgetown, Inc. v. District of Columbia Zoning Comm'n,* 402 A.2d 36, 41 (D.C.1979). We review the agency's decision to determine whether it is arbitrary, capricious or an abuse of discretion. *Cooper v. District of Columbia Dep't of Employment Servs.,* 588 A.2d 1172, 1174 (D.C.

1991) (noting the agency decision is presumed to be correct and the petitioner bears the burden of demonstrating error).

 Petitioner contends that the government did not meet its burden of proof in demonstrating that she committed abuse because it relied on administrator Nash's observations of the alleged incident. Petitioner asserts that there was no additional evidence to show that Nash's observations were more accurate than petitioner's account of what happened during the incident. Petitioner's argument is without merit, for the agency examiner was entitled to assess the credibility of each witness. *See Allen v. District of Columbia Bd. of Elections & Ethics,* 663 A.2d 489, 495 (D.C.1995) ("Deference to the Board's findings is especially appropriate where ... the decision was based in part on its assessment of the credibility of the witnesses...."). The agency examiner was entitled to evaluate Nash's eyewitness account of the incident, and also petitioner's admission that she had reprimanded and grabbed Ms. Jordan by the wrist. The examiner could also consider petitioner's admission that her treatment of Ms. Jordan was "[her] way" of handling difficult patients. Furthermore, there was no error in the examiner's considering the testimony of the nurse investigator whose testimony included some hearsay. *Wisconsin Avenue Nursing Home v. District of Columbia Comm'n on Human Rights,* 527 A.2d 282, 288 (D.C.1987) (noting "hearsay evidence can serve under some circumstances as 'substantial evidence' on which to base a finding of fact").

Petitioner also asserts that the Attorney Examiner erred in failing to consider the definition of "abuse" as found at 42 CFR § 488.301 (1996). Abuse is defined there as "the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish." Petitioner asserts that the government failed to prove that she acted willfully or that the resident suffered any physical harm, pain or mental anguish.

While it is unclear from the record exactly what definition of "abuse" was employed, we find no error in the agency's finding of fact that petitioner committed an act which con-

stituted violence against the resident in violation of 42 CFR § 483.13(c)(1). That section states in part:

> (1) The facility must—
>
> (i) Not use verbal, mental, sexual, or physical abuse, corporal punishment, or involuntary seclusion....

The government points out that 29 DCMR § 3299.1 (1991), part of the District's comprehensive regulations governing nurse aides, defines "abuse" as "the infliction of physical or mental harm on a nursing home resident." Applying that definition of abuse, the record supports the agency's finding that petitioner's name should be placed on the abuse list of the registry.

█ Even if the agency applied the definition of abuse urged by petitioner, namely that found in 42 CFR § 488.301, petitioner's argument would not prevail. Petitioner argues that she did not intentionally ("willful[ly]") abuse the resident, but the regulation cannot reasonably be understood to mean that she must have acted with a "bad purpose" (*i.e.*, to abuse); rather, "willful" in this regulatory context denotes a conscious decision to do the act which the law forbids. *Cf. Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (except in criminal context where "willful" may require "more ... than the doing of the act proscribed by the statute," word commonly "denotes an act which is intentional rather than accidental"). The record here permits a finding that petitioner intentionally[1] "inflict[ed] ... intimidation" upon the resident in a manner "[un]reasonable" both in itself and in light of the training petitioner had received for dealing with "difficult situations." Moreover, although there was no apparent proof that the dragging or pulling of the resident resulted in "physical harm [or] pain,"[2] the agency could rationally conclude that rough pulling and rebuking of any elderly individual would naturally cause such pain or at least "mental anguish." It is true that no pattern of repeated maltreatment of residents by petitioner was alleged or found, and a single act of reprimanding a resident and dragging her a short distance (though by a nurse aid admitting that "[t]his is my way") may strike some as disproportionate to the remedy of *permanent* placement of petitioner's name in the Abuse Section of the nurse aide registry.[3] But this court may not substitute its own notions of abusive conduct for those of the agency charged with interpreting and applying the regulatory standard. *See, e.g., Kegley v. District of Columbia,* 440 A.2d 1013, 1018 (D.C.1982). The position of nurse aide, carefully regulated both federally and locally, is one of trust; petitioner's training had provided her with ample notice that handling difficult patients in the manner she did here was improper; and the definition of "abuse" in the context of this dependency relationship may fairly be understood to reach behavior short of more flagrant forms dealt with in other settings.

Judge Schwelb argues that the hearing examiner "made no attempt to examine the regulatory language or to discuss its application to the facts of this case, nor did he attempt to articulate or ascertain the legal meaning of the term ['abuse']." *Post* at 1185. But the legal meaning of the term is set forth in the definitions (in substance the same) which we have discussed, and there is not the slightest reason to think that the examiner ignored it. Nor is it apparent how additional "examin[ation of] the regulatory language" could have led the examiner to evaluate differently the uncomplicated testimony that led to his finding of abuse. Since the reasoning of the examiner can be easily traced from his recitation of the evidence and the conclusion

---

1. When interviewed at the time of the incident, petitioner explained that though she intended no harm to the resident, "[t]his is my way."

2. According to the investigator's report, the resident had Alzheimer's Disease and could not be engaged in a "meaningful" interview as a result.

3. 42 CFR § 483.156(c)(1)(iv)(D) (1996) provides that information "on any finding by [a] State ... of abuse" by a nurse aide "must remain in the [nurse aide] registry permanently, unless the finding was made in error, the individual was found not guilty in a court of law, or the State is notified of the individual's death." Notably, 29 DCMR § 3253.9 (1991) states differently that "[a]n entry in the Abuse Section of the Registry shall remain for a period of five [5] years, after which the nurse aide may apply for its removal by submitting the documentation requested by the Acting Director." DCRA must reconcile these two provisions in the event petitioner—and anyone else—seeks removal of their name from the Abuse Section of the registry.

he drew from it, there is no basis for the remand and further articulation of reasons that Judge Schwelb would require.

### III.

Accordingly, the decision of DCRA is

*Affirmed.*

SCHWELB, Associate Judge, dissenting:

### I.

The record in this case, viewed in the light most favorable to the District, reflects that on January 24, 1995, petitioner Mardell Hearns, a Certified Nursing Assistant (CNA) at the Grant Park Care Center, grabbed Laura Jordan, an elderly patient, by the arm and pulled or dragged Ms. Jordan from the hallway to her room. It is also alleged that Ms. Hearns spoke roughly to her patient and shook her finger in Ms. Jordan's face.[1] There was no evidence that Ms. Jordan sustained any injury or required medical treatment.

Ms. Jordan, the victim of the alleged abuse, was suffering, *inter alia,* from Alzheimer's Disease and from hypertension. Her medical record disclosed that she "exhibited alteration in thought processes with impairment of memory and judgment." According to the facility's "Nursing Manager," Ms. Jordan could be "difficult to handle." When Nancy T. Lee, the Nurse Consultant who investigated the allegation of abuse, attempted to interview Ms. Jordan, the patient "spoke in a loud outburst," but did not respond to Ms. Lee's questions. It also appears that Ms. Jordan may have been cursing Ms. Hearns at the time of the encounter here at issue.

Ms. Hearns had served as a CNA since 1987. At the time of the incident, Ms. Hearns had held this position for a period of more than seven years. The hearing examiner explicitly found that Ms. Hearns had a "good record." Nevertheless, her name was "permanently" placed in the Abuse Section of the Nurse Aide Registry. The record does not reveal whether this placement had the practical effect of disqualifying Ms. Hearns forever from employment as a CNA, see maj. op., *ante,* at note 3, but the consequences for Ms. Hearns are obviously very serious.[2] Indeed, it may well be that, for all practical purposes, Ms. Hearns' career in her chosen profession is over.

"Proportionality is of consummate importance in judicious adjudication." *Allen v. United States,* 603 A.2d 1219, 1227 (D.C.) (en banc) *cert. denied,* 505 U.S. 1227, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992). The Mikado's "object all sublime . . . to let the punishment fit the crime" should apply to agency practice as well. In this case, the majority has acknowledged that "some"[3] might view the remedy as disproportionate to the alleged wrongdoing. I agree with my colleagues that a court may not substitute its own judgment for that of the agency "charged with interpreting and applying the regulatory standard." See maj. op. at 1183. It is the court's responsibility, however, to inquire whether the agency has given "full and reasoned consideration to all material facts and issues" and to insure "that the agency has taken a hard look." *Eilers v. District of Columbia Bureau of Motor Vehicles Servs.,* 583 A.2d 677, 686 (D.C.1990) (citations omitted). In my opinion, a "hard look" at the record demonstrates that the agency has not done what it is supposed to do.

### II.

Ms. Hearns was disciplined for "abuse" of her patient. The only legal provision referring to the term "abuse" cited by the hearing examiner was 42 CFR § 483.13(c)(1). That regulation states in pertinent part that a

---

1. Ms. Hearns stated to the investigator that she took Ms. Jordan firmly by the wrist for the sole purpose of guiding her back to her room. She denied that she held her patient in a tight or jerky hold, or otherwise abused her. Ms. Hearns admitted that she briefly shook her finger at Ms. Jordan. In her written response to the allegations, Ms. Hearns wrote: "I admit to pulling her by the arm, but it was not my intention to ever abuse anybody at any time. If I did I am sorry."

2. Ms. Hearns was terminated by Grant Park Care Center immediately after the incident.

3. I believe that the word "some" could fairly be expanded to "many" or even to "most" reasonable people.

covered facility must not use "verbal, mental, sexual or physical abuse, corporal punishment, or involuntary seclusion," but it contains no definition of any of these terms. The examiner did not consider or even mention 42 CFR § 488.301, which defines abuse as

the willful infliction of injury, unreasonable confinement, intimidation, or punishment, with resulting physical harm, pain or mental anguish.

The examiner's decision does not disclose why Section 488.301 should not apply.[4] Even if we were to assume, *arguendo*, that Section 483.13, which does not define the term "abuse," was the only applicable provision, the hearing examiner made no attempt to examine the regulatory language or to discuss its application to the facts of the case, nor did he attempt to articulate or ascertain the legal meaning of the term. Indeed, his entire decision consists of a rote recitation of the testimony before him and the following operative Findings of Fact and Conclusions of Law:

1. That on or about January 24, 1995, at the Grant Park Care Center, the Respondent, Mardell Hearns, did commit an act which constituted violence against the Resident, Laura Jordan, in violation of 42 CFR Part 483.13.

2. That as a result of having been found liable for engaging in said act of violence, the Respondent's name should be permanently placed on the list of persons identified in the Abuse Section of the Nurse Aide Registry.

### CONCLUSIONS OF LAW

The Attorney Examiner concludes that the Government has met its burden of proof in the allegation before this tribunal.

The Attorney Examiner further concludes that, as a matter of law, the name of Mardell Hearns, should be permanently placed in the Abuse Section of the Nurse Aide Registry, pursuant to 29 DCMR 3251.1 and 3251.2.

In my opinion, this will not pass muster. We have held that "[n]either the repetition of the statutory[5] language ... nor a summary of the evidence of the witness[es] credited by the agency satisfies the requirements of the [District's Administrative Procedure] Act." *Eilers, supra,* 583 A.2d at 686 (citation omitted). On the contrary, it is incumbent upon the agency to make a "meaningful attempt to come to grips with the difficult factual [and legal] issues raised by this record." *Id.* at 685.

"It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *Coumaris v. District of Columbia Alcoholic Beverage Control Bd.,* 660 A.2d 896, 902 (D.C. 1995). Although, as my colleagues point out, we should accord appropriate weight to the agency's interpretation of the regulatory standard, the occasion for such deference is a great deal less where, as in this case, the examiner failed even to mention any potentially applicable definition of abuse and made no attempt to analyze the language or purpose of the one non-definitional provision that he did cite. Indeed, as we stated in *Coumaris,*

[n]o deference is appropriate ... where the agency has failed to identify the question of statutory construction to be addressed. *See Zenian v. District of Columbia Office of Employee Appeals,* 598 A.2d 1161, 1166 (D.C.1991). The canon requiring courts to accord weight to the administrative construction of a statute has no logical application where the agency has engaged in a practice without having made any discernable attempt to construe the purportedly ambiguous terms of the legislation. *See The Mail Divisor Cases,* 251 U.S. 326, 332–33, 40 S.Ct. 162 [163–64], 64

---

4. The apparent applicability of a "federal" definition of "abuse" arises from the Grant Park Care Center's status as a nursing facility participating in a federally-funded program pursuant to 42 U.S.C. § 1396a–u (1992). A separate "District" definition appears in 29 DCMR § 3299.1 (1991), and states that abuse is "the infliction of physical or mental harm on a nursing home resident." I pretermit any discussion of the question whether the "federal" and "District" definitions are consistent with one another and, if not, what consequences flow from any inconsistency. These issues should initially be addressed by the agency and, in any event, the examiner here did not consider *any* definition.

5. Or, as in this case, regulatory.

L.Ed. 290 ... (1920) (plurality opinion per Holmes, J.), *aff'g K.C.M. & O. Ry. Co. v. United States*, 53 Ct. Clm. 258 (1918). It would be incongruous to accord substantial weight to an agency's interpretation of a statute where the record is barren of any indication that the agency gave any consideration at all to the statutory language or to the structure or purpose of the provisions which were ostensibly being construed.

*Id.* at 899–900 (footnote omitted).

It is not at all obvious that Ms. Hearns' conduct constituted abuse under any reasonable definition of that word. In *Kentucky Bd. of Nursing v. Ward*, 890 S.W.2d 641 (Ky.App.1994), *review denied*, (Ky.1995), a nurse, using a stern tone of voice, spoke to a "difficult" nursing home patient as follows: "If you don't sit down and be quiet, I will take you to your room and tie you in the bed and you won't be able to get up." *Id.* at 642–43. Like Ms. Hearns, the nurse in *Ward* had a good record prior to the incident. *Id.* at 643. The Board of Nursing determined that the nurse's conduct constituted "verbal abuse," suspended her license for one year, and fined her $1,000. *Id.* at 642. The trial court, however, set aside the Board's order, and the Kentucky Court of Appeals affirmed.

The appellate court held that reasonable people would not, under all of the circumstances, view the nurse's actions as constituting "abuse." *Id.* at 643. In the court's view, "[t]his conduct, by itself, is not sufficient to establish that she is unfit to provide nursing." *Id.* at 643–44.[6] *See also Methodist Church Home For Aged v. Service Employees Int'l Union Local No. 144*, 1997 WL 137440, 1997 U.S. Dist. Lexis 3385 (S.D.N.Y. Mar. 25, 1997) (questioning whether nursing home employee's conduct in "grabbing the patient's head in her hands and, forcefully shaking it back and forth" constituted "the type of patient abuse which precludes further employment by a nursing home"); Emile F. Short, Annotation, Revocation of Nurse's License to Practice Profession, 55 A.L.R.3d 1141 (1974 & 1997 Supp.).[7]

The cases that I have cited are not factually on all fours with the present one, and I do not necessarily suggest that the courts of this jurisdiction should follow them. I do believe, however, that these decisions demonstrate that the issue before us is a difficult one, and that too much is at stake here for this court to permit Ms. Hearns' livelihood to be destroyed or impaired without a more reasoned application by the agency of the law to the facts.[8] I would therefore remand the case

**6.** The court also adopted the following passage from the trial judge's ruling

Many times, the aging process reduces otherwise active, alert, and oriented patients to varying degrees or states of confusion or dementia. It is no secret that many people experience a reversion to childlike behavior in their later years. This is a condition commonly witnessed in a nursing home setting where the vast majority of patients are infirm due to advanced age. It is also no secret, as undesirable as it may be, that oftentimes a stern tone of voice becomes necessary to get a patient's attention or to impress upon him the need to follow instructions or exercise caution, much the way as is often necessary in dealing with young children. One isolated incident of use of a stern tone of voice communicating to the patient what action will be taken if the patient does not follow instructions does not rise to the level of conduct prohibited by [the applicable statute].

*Id.* at 944.

**7.** In *Gogebic Med. Care Facility v. AFSCME Local No. 992*, 209 Mich.App. 693, 531 N.W.2d 728 (1995) *appeal denied*, 450 Mich. 951, 549 N.W.2d 560 (1995), the court quoted with approval applicable language from the Michigan Department of Public Health's policy handbook:

[T]he following factual situations would provide a reasonable basis for concluding that a finding of mental or emotional abuse is warranted:

a. The interaction coerces or intimidates the patient or resident into surrendering his or her money or personal belongings; or

b. The interaction subjects the patient or resident to scorn, ridicule or humiliation; or

c. The interaction produces a noticeable level of fear, anxiety, agitation, withdrawal or other emotional distress in the patient or resident which is not otherwise explainable.

d. The interaction involves a threat of physical harm, punishment, or deprivation.

*Id.* 531 N.W.2d at 730. These categories are apparently meant to be illustrative rather than exclusive, but I question whether Ms. Hearns' one-time interaction with Ms. Jordan would constitute abuse under this standard, which I view as a reasonable one.

**8.** I think it is quite a stretch to say that Ms. Hearns' actions amounted to the "willful infliction of injury," in violation of the applicable language in the federal definition of "abuse." The District's definition does not contain a requirement of willfulness, see note 4, *supra*, but there is not much evidence to support a finding

for further proceedings. Because my colleagues view the case differently, I respectfully dissent.

that Ms. Hearns inflicted physical or mental harm. Under these circumstances, the hearing

examiner should at least be required to explain his reasoning.