SANDRA SALMON *v.* DEPARTMENT OF PUBLIC
HEALTH AND ADDICTION SERVICES
(SC 16400)

Sullivan, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued September 12, 2001—officially released February 5, 2002

*Edward F. Osswalt,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Richard J. Lynch,* assistant attorney general, for the appellant-appellee (defendant).

*James R. Smart,* with whom, on the brief, was *Steven D. Ecker,* for the appellee-appellant (plaintiff).

*Opinion*

BORDEN, J. The principal issues in this certified appeal and cross appeal are whether: (1) pursuant to General Statutes § 20-102cc (a),[1] a subjective or objective test should be applied in determining whether a nursing home resident has suffered any harm or adverse impact as a result of alleged abuse by her caregiver; (2) the definition of resident abuse under the aforementioned statute requires an element of intent or wil-

---

[1] *General Statutes* § 20-102cc (a) provides: "The Department of Public Health shall receive, investigate and prosecute complaints against individuals who are providing or have provided services as a nurse's aide in a chronic and convalescent nursing home or rest home with nursing supervision. The grounds for complaint shall include resident abuse, resident neglect, misappropriation of resident property, and fraud or deceit in obtaining or attempting to obtain a registration as a nurse's aide. A nurse's aide shall be given written notice by certified mail by the commissioner of any complaint against him. The nurse's aide may, within thirty days of the date of the notice, make a request in writing for a hearing to contest the complaint. The commissioner shall render a finding on such complaint, and, if a hearing is requested, it shall be conducted pursuant to chapter 54. The commissioner shall have the authority to render a finding and enter such finding on the registry against an individual who is providing or has provided services as a nurse's aide in a chronic and convalescent nursing home or rest home with nursing supervision, without regard to whether such individual is on the registry or has obtained registration as a nurse's aide from the department."

Public Acts 1993, No. 93-121, § 4, which went into effect on June 14, 1993, was applicable at the time of the alleged abuse in this case. That act became codified as General Statutes § 20-102cc (a). Although the statute has since been amended, the changes are not relevant to this appeal. References herein to § 20-102cc (a) are to the current revision of the statute.

fulness, and if so, the proper meaning of such term; and (3) the Appellate Court improperly affirmed the trial court's denial of the plaintiff's motion to remand the case to the defendant, the department of public health and addiction services (department),[2] for the taking of additional evidence. We reverse the judgment of the Appellate Court.

The present case involves allegations of verbal abuse brought by Vivian Tschauder against the plaintiff, Sandra Salmon, a nurse's aide at the Shelton Lakes Residence and Health Care Center (Shelton Lakes) where Tschauder resided. Upon learning of the purported abuse, Shelton Lakes terminated the plaintiff's employment and reported her to the department, which formally charged her with violating 42 U.S.C. § 1395i-3 (c) (1) (A) (ii) (1988)[3] and 42 U.S.C. § 1395i-3 (g) (1) (C) (Sup. V 1993).[4] After an investigation and hearing, the

[2] On July 1, 1995, the department of public health and addiction services became known as the department of public health. See Public Acts 1995, No. 95-257, §§ 12, 21, 58.

[3] Title 42 of the United States Code § 1395i-3 (c) (1988) sets forth the obligations of nursing homes with respect to patients' rights. Subdivision (1) (A) provides in relevant part: "A skilled nursing facility must protect and promote the rights of each resident, including . . .

"(ii) . . . [t]he right to be free from physical or mental abuse . . . ."

[4] Title 42 of the United States Code § 1395i-3 (g) (Sup. V 1993) discusses the individual states' involvement in the survey and certification process of nursing homes covered by the federal statute. Subdivision (1) (C) provides: "The State shall provide, through the agency responsible for surveys and certification of nursing facilities under this subsection, for a process for the receipt and timely review and investigation of allegations of neglect and abuse and misappropriation of resident property by a nurse aide of a resident in a nursing facility or by another individual used by the facility in providing services to such a resident. The State shall, after notice to the individual involved and a reasonable opportunity for a hearing for the individual to rebut allegations, make a finding as to the accuracy of the allegations. If the State finds that a nurse aide has neglected or abused a resident or misappropriated resident property in a facility, the State shall notify the nurse aide and the registry of such finding. If the State finds that any other individual used by the facility has neglected or abused a resident or misappropriated resident property in a facility, the State shall notify the appropriate licensure authority. A State shall not make a finding that an

department found Tschauder's allegations to be substantiated, and entered the plaintiff's name in the statewide registry of nurse's aides. See footnote 1 of this opinion. Thereafter, the plaintiff appealed from the department's decision to the Superior Court pursuant to General Statutes § 4-183[5] of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq. The trial court sustained the appeal, determining that the department had improperly found the existence of resident abuse without making the predicate finding that the plaintiff's inappropriate and vulgar language had adversely affected Tschauder. The court remanded the case to the department for purposes of determining whether the existing record supported such a finding. The plaintiff then appealed, and the department cross appealed, from the judgment of the trial court to the Appellate Court. A majority of the Appellate Court, with *Schaller, J.,* dissenting, affirmed the judgment of the trial court. *Salmon* v. *Dept. of Public Health & Addiction Services,* 58 Conn. App. 642, 669, 754 A.2d 828 (2000). Following our grant of certification to appeal,[6]

individual has neglected a resident if the individual demonstrates that such neglect was caused by factors beyond the control of the individual."

[5] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

[6] We granted the department's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that a subjective test and not objective test should be applied under the provisions of General Statutes § 20-102cc (a) to determine whether a nursing facility resident had been harmed or adversely impacted as a result of an act of resident abuse?" *State* v. *Dept. of Public Health & Addiction Services,* 254 Conn. 926, 761 A.2d 754 (2000).

We also granted the plaintiff's petition for certification to appeal on the following issues: (1) "Does resident abuse under General Statutes § 20-102cc (a) require an element of intent or wilfulness?" and (2) "Did the Appellate Court properly affirm the trial court's denial of the plaintiff's motion to present additional evidence upon the remand?" *Salmon* v. *Dept. of Public Health & Addiction Services,* 254 Conn. 926, 761 A.2d 754 (2000).

the department appealed, and the plaintiff cross appealed, to this court.

The following additional factual and procedural history is relevant to the resolution of this appeal and cross appeal. "In August, 1993, the plaintiff was employed as a registered nurse's aide at Shelton Lakes . . . . On August 18, 1993, Shelton Lakes terminated the plaintiff's employment on the basis of allegations of patient abuse and reported the accusations to the department. On April 27, 1994, the department brought formal charges against the plaintiff, alleging that she had violated 42 U.S.C. § 1395i-3 (c) (1) (A) (ii) (1988) and 42 U.S.C. § 1395i-3 (g) (1) (C) (Sup. V 1993)[7] in that she had abused [Tschauder] . . . 'by using vulgar and inappropriate language and intimidating the resident [while] rendering incontinent care' to her." *Salmon* v. *Dept. of Public Health & Addiction Services,* supra, 58 Conn. App. 645. More specifically, the department credited Tschauder's allegations that the plaintiff used the word "pussy" several times while cleaning her perineal area. Id., 646.

"The department notified the plaintiff by letter . . . dated May 9, 1994, that the charges against her had been dismissed for insufficient evidence. On May 16,

---

[7] Although the plaintiff was expressly charged with a violation of federal law, our analysis proceeds under the state statute that is designed to implement the directives contained within the federal legislation. As noted by the trial court, the federal provisions cited in the charging document "set forth the states' responsibilities for assuring quality of care at skilled nursing facilities, including the investigation of allegations of resident neglect and abuse. . . . General Statutes § 20-102cc [(a), which authorizes the department 'to receive, investigate, and prosecute complaints' concerning resident abuse] is the statute arising from that mandate." The state statute, which endows the department with jurisdiction over the present case, was thus incorporated within the federal charges and controls our analysis. Neither the failure specifically to cite to § 20-102cc (a), nor the reference to federal law contained within the charging documents, compels a different result, especially in light of the fact that we certified the issues presented in this case under the state statute alone.

1994, Mary C. Crowley, a Shelton Lakes administrator, wrote a letter to Donna Buntaine Brewer, chief hearing officer at the department, stating, inter alia, that it was Crowley's understanding 'from our telephone conversation today, that at no time was the complaining resident interviewed by your department and, therefore, you are reopening the case as of today.'[8] On May 20, 1994, the department notified the plaintiff that it had sent the dismissal letter in error.

"On August 16, 1994, the department served the plaintiff with notice of the hearing and the statement of the charges, which the plaintiff, through her attorney, answered on September 4, 1994. A hearing before a department hearing officer was held on December 16, 1994. At the hearing, Tschauder testified, 'I was all naked there, and she's wiping me and she said, "That's pussy." She kept wiping me, wiping me, saying, "Pussy, pussy, pussy," all the time I'm—away from it all. I couldn't.' Tschauder [also] testified that she was not afraid of the plaintiff after that incident, but that the plaintiff had frightened her that night.

"In her defense, the plaintiff denied ever physically or verbally abusing Tschauder. The plaintiff testified that on the night before Tschauder made the accusation, the plaintiff had a dispute over an unrelated bath incident with coworker Diane Thorpe, the nurse's aide who reported the Tschauder allegation to the head nurse [at Shelton Lakes]. The plaintiff further testified that Thorpe allegedly told her that night that she would 'get' the plaintiff. The plaintiff also called Crowley and the Shelton Lakes director of nursing, Mary Frances Wolf, to testify. Crowley gave testimony regarding her investigation of the alleged incident with Tschauder and the

---

[8] We note that, at the time of this exchange, the plaintiff had filed a complaint of discrimination on the basis of race and national origin against Shelton Lakes that was pending before the Connecticut commission on human rights and opportunities.

termination of the plaintiff's employment. Wolf testified regarding Tschauder's physical condition and mental state.

"On January 20, 1995, the hearing officer issued a proposed final decision in which he determined that Tschauder's testimony was more credible than the plaintiff's and that Tschauder 'had nothing to gain by fabricating a story, as [the plaintiff's] attorney suggested she was doing. She was consistent in the main points of her testimony on both direct and cross-examinations. She not only told Diane Thorpe, but also Mary Crowley and Mary Frances Wolf what had happened.'

"On February 15, 1995, the commissioner of public health and addiction services (commissioner) adopted the proposed decision as the final decision in the case . . . [and] found that the plaintiff had abused the patient through intimidation, and by using vulgar and inappropriate language. [Subsequently, however] [t]he commissioner . . . sent a letter to the plaintiff's attorney notifying him that the February 15, 1995 final decision had been sent in error because the department had not been notified that the plaintiff had timely requested an opportunity to file exceptions to [and to present oral argument regarding] the proposed final decision . . . . After both parties filed briefs and oral argument was heard on March 24, 1995, [the commissioner issued] another final decision . . . on April 25, 1995. That decision adopted and incorporated the January 20, 1995 proposed final decision in which the hearing officer determined that patient abuse had occurred . . . on the basis of the use of vulgar and inappropriate language [but rejected the proposed finding of intimidation]. . . . [T]he commissioner's decision [also ordered] that 'a finding of resident abuse [shall] be listed

on the Connecticut Nurse Aide Registry [registry], and that this final decision [shall] be filed in the registry."[9]

"The plaintiff thereafter appealed from the department's decision to the Superior Court pursuant to . . . § 4-183 . . . claiming that the department (1) lacked jurisdiction to hear the complaint, (2) violated her due process rights, (3) relied on testimony that lacked credibility and (4) exceeded its statutory authority by finding that vulgar and inappropriate language constituted abuse." Id., 645–48. The plaintiff also moved, pursuant to § 4-183 (h), for a remand to the department in order to present additional evidence concerning the credibility of both Tschauder and the staff from Shelton Lakes who had testified at the original hearing. In a separate ruling, the trial court denied the plaintiff's motion.

"The court sustained the plaintiff's appeal on the sole ground that the plaintiff's substantial rights were prejudiced by the department's determination of resident abuse without the requisite finding that the plaintiff's use of vulgar and inappropriate language had an adverse affect on the patient.[10] The court remanded the

_____

[9] According to regulations promulgated by the federal Health Care Financing Administration, a guilty finding regarding a charge of resident abuse entered in the state nurse aide registry bars an individual from further employment in a nursing home. See 42 C.F.R. § 483.13 (c) (1) (ii) (B) ("facility must . . . [n]ot employ individuals who have . . . had a finding entered into the State nurse aide registry concerning abuse, neglect, mistreatment of residents or misappropriation of their property").

[10] The trial court rejected all other claims advanced by the plaintiff on appeal. Specifically, the court concluded that: (1) the department had jurisdiction to prosecute a complaint against the plaintiff despite the fact that the charging document alleged a violation of federal, rather than state, law; (2) the plaintiff's due process rights were not violated by the department's failure to promulgate regulations defining "resident abuse" where no authority was produced indicating an obligation on the part of the department to do so; and (3) the department's findings regarding Tschauder's credibility were not clearly erroneous where it was established that Tschauder had no motive for fabricating the incident and was consistent in the main points of her testimony. The plaintiff's fourth, and final, claim before the trial court was that the department exceeded its statutory authority by finding that vulgar and inappropriate language constituted resident abuse. It was in the

case to the department for further proceedings on the existing record to state its findings as to whether the language at issue had an adverse impact on Tschauder." Id., 648. The plaintiff then appealed, and the department cross appealed, from the judgment of the trial court to the Appellate Court. Id.

In her appeal to the Appellate Court, the plaintiff claimed, inter alia,[11] that the trial court had "improperly . . . interpreted General Statutes § 20-102cc (a) as not requiring an element of intent and . . . abused its discretion in denying her motion to present additional evidence." Id., 644. The plaintiff also joined the department's cross appeal, which challenged the trial court's remand of the case for a determination of whether Tschauder had been harmed by the alleged verbal abuse.[12] Id., 644–45. Although the Appellate Court

context of this issue that the trial court found the department's conclusion of resident abuse improper in the absence of any explicit finding as to how, or if, the language used had affected Tschauder.

[11] The plaintiff raised a total of five claims in her appeal to the Appellate Court. Specifically, the plaintiff argued that "the [trial] court improperly (1) concluded that the department had jurisdiction to hear the complaint, (2) concluded that her due process rights were not violated, (3) concluded that the department relied on credible testimony, (4) interpreted General Statutes § 20-102cc (a) as not requiring an element of intent and (5) abused its discretion in denying her motion to present additional evidence. In addition, the plaintiff and the department [both claimed] that the court improperly remanded the case to the department" for a finding that Tschauder was harmed by the plaintiff's conduct. *Salmon* v. *Dept. of Public Health & Addiction Services*, supra, 58 Conn. App. 644–45. Issues one through three are not before us in this certified appeal.

[12] Although both parties objected to the remand ordered by the trial court, they did so for different reasons. The plaintiff argued that "because the allegation of intimidation was specifically rejected by the commissioner, the court, as a matter of law, should have concluded that there was no adverse impact and, thus, no resident abuse." *Salmon* v. *Dept. of Public Health & Addiction Services*, supra, 58 Conn. App. 665. The department claimed that, by remanding the case for a determination of whether Tschauder had been adversely impacted by the plaintiff's verbal abuse, "the court improperly applied a subjective test . . . ." Id., 665–66. In the Appellate Court, as in this court, the department maintained that "the court should have applied an objective test," which, on the facts of this case, would have led to a finding of harm, thus vitiating the need for a remand. Id., 666.

declined to determine whether intent was an element of § 20-102cc (a), citing the plaintiff's failure properly to raise that argument in the trial court; id., 662–63; the court affirmed the trial court's judgment in all other respects. Id., 669. This certified appeal and cross appeal followed.

With respect to the department's appeal, both parties agree that: (1) the term "resident abuse," as used in § 20-102cc (a), requires that the nursing home resident suffer harm or adverse impact as a result of the alleged abuse; and (2) an objective, rather than a subjective, test should be applied in making that determination. We agree, and reverse the Appellate Court's judgment to the contrary.

With respect to the plaintiff's first issue on her cross appeal, both parties also agree that an element of wilfulness is statutorily required for a finding of resident abuse under § 20-102cc (a). The dispute between them is over the appropriate definition of that term. The plaintiff urges us to adopt an interpretation that would encompass a specific intent to produce a harmful result. The department, however, advocates a definition that would equate the term "wilful" with "voluntary act." We conclude that the meaning of the term "wilful" advanced by the department is more persuasive, for the reasons set forth herein. Finally, with respect to the second issue raised on the cross appeal, the plaintiff contends that the Appellate Court improperly affirmed the trial court's denial of her motion to present additional evidence to the department concerning (1) Tschauder's mental and emotional health, (2) an alleged recantation by Tschauder, and (3) certain biases against the plaintiff allegedly harbored by the personnel and administration at Shelton Lakes. We agree, and reverse the judgment of the Appellate Court to the contrary.

I

The sole issue raised by the department's appeal is whether, pursuant to the mandate of § 20-102cc (a), a subjective or objective test should be applied in determining the extent of harm suffered by a nursing home resident as a result of alleged abuse by her caregiver. Both parties argue, contrary to the conclusion of the Appellate Court, that an objective standard should be used. We agree.

This issue, which requires us to define the term "resident abuse," presents a question of statutory interpretation. "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same subject matter." (Citation omitted; internal quotation marks omitted.) *Andersen Consulting, LLP* v. *Gavin,* 255 Conn. 498, 512, 767 A.2d 692 (2001).

We begin our analysis by noting that the term "resident abuse" strongly suggests, as both the parties and members of the Appellate Court panel agreed, that there be some harm, whether physical or emotional, to the resident as a result of the caregiver's conduct. A more difficult question is whether such harm should be measured by a subjective test, which would inquire whether the particular resident actually felt or perceived some harm, or an objective test, which would require a determination of whether a reasonable, sentient, and cognizant resident would regard the conduct as harmful.

Although the language of the statute could be read as pointing in either direction, the history and purpose of the statute strongly suggest that the test be objective.

The provision at issue is part of a larger statutory scheme designed to implement federal directives relating to nursing home reform. In 1987, Congress passed the Omnibus Budget Reconciliation Act; Pub. L. No. 100-203, §§ 4201 through 4202, 101 Stat. 1330-160 through 1330-179; which amended the Social Security Act to establish certain standards designed to improve the quality of care for residents of nursing homes that receive federal funding via medicare and medicaid. See H.R. Rep. No. 100-391, Pt. 1, p. 452 (1987); Medicare and Medicaid Programs: Survey, Certification and Enforcement of Skilled Nursing Facilities and Nursing Facilities, 59 Fed. Reg. 56116 (1994). The Omnibus Budget Reconciliation Act also called upon each state to enact legislation pertaining, in part, to the survey and certification process for participating facilities, as well as the training and evaluation of individuals staffing and administering nursing homes. See id. General Statutes §§ 20-102aa through 20-102ff implement this mandate.[13]

During a public hearing on the forerunner of these provisions, House Bill No. 7245, No. 93-121 of the 1993 Public Acts, several commentators stressed that the purpose of the proposed legislation was to comport with the directives contained in the Omnibus Budget Reconciliation Act and thereby protect nursing home residents against substandard care state-wide. See generally Conn. Joint Standing Committee Hearings, Public Health, Pt. 5, 1993 Sess., p. 1707. They further noted that

---

[13] Ruth Ostfeld, executive director of the Connecticut coalition on aging, expressly recognized in a public hearing regarding House Bill No. 7245, which was later codified at §§ 20-102cc through 20-102ff, that the bill would "bring Connecticut into compliance with federal mandates established in [the Omnibus Budget Reconciliation Act] . . . ." Conn. Joint Standing Committee Hearings, Public Health, Pt. 5, 1993 Sess., p. 1743.

the state statute would actually exceed the protections afforded by the federal act in two important ways: (1) by enlarging the department's jurisdiction to reach allegations of wrongdoing perpetrated by individuals acting in the capacity of nurse's aides who were not yet registered; and (2) by denying registration to those individuals who had engaged in the mistreatment of residents or who had falsified their credentials in order to obtain employment. See id., p. 1708.

In commenting on the significance of the proposed bill, Stanley Peck, director of the division of medical quality assurance in the department of health services, observed that "[n]urse's aides provide the bulk of hands-on care for nursing home residents. These residents are often frail, unable to communicate or otherwise unable to advocate for their needs and their own safety. . . . It is extremely important that the care these vulnerable patients receive is delivered by qualified individuals who can manage the challenges without becoming abusive." Id. Moreover, Representative Joseph D. Courtney, during the House debate on the proposed legislation, stated that the "bill . . . will in fact result in greater protection of frail elderly who are receiving services in nursing homes where abusive aides are engaging in some type of inappropriate behavior or misconduct." 36 H.R. Proc., Pt. 9, 1993 Sess., p. 3039.

The legislative history of § 20-102cc (a), coupled with its relationship to federal law, reveals that the statute's primary goal is to protect all nursing home residents against acts of abuse perpetrated by their purported caregivers. In order to address this concern effectively, an objective standard must be used in determining whether a resident has suffered any harm or adverse impact as a result of alleged abuse. If a subjective standard were to be employed, those residents who are impaired or incapable of perceiving or articulating their individual experiences would be excluded from the pro-

tection otherwise afforded by the statute; abuse, as a matter of law, could never be established in such cases. There is no evidence that the legislature intended such a result. Nor is there any evidence, in either the plain language or history of the statute, to suggest that the legislature intended a dualistic scheme that would apply a subjective standard to some residents and an objective standard to others. To the contrary, the legislative history surrounding 42 U.S.C. § 1395i-3 (g), which § 20-102cc (a) was designed to implement, provides in the House Committee report on the Omnibus Budget Reconciliation Act that the amendment "would *require that a nursing facility [treat] all of its residents the same way* in providing those specific items and services that are required by the State Medicaid program." (Emphasis added.) H.R. Rep. No. 100-391, Pt. 1, pp. 458–59 (1987). Thus, the purpose of the statute strongly suggests the conclusion that whether a resident has been harmed by alleged abuse be determined by reference to an objective standard.

The federal legislation that §§ 20-102cc through 20-102ff is designed to implement also supports this conclusion. In enacting regulations concerning nurse's aides and allegations of resident abuse, the federal Health Care Financing Administration considered adopting a definition of abuse that would have required that a resident actually "perceive the conduct as abusive." Medicare and Medicaid Programs, supra, 59 Fed. Reg. 56116, 56130 (1994). The Health Care Financing Administration rejected this requirement, commenting that: "*Our obligation is to protect the health and safety of every resident, including those that are incapable of perception or are unable to express themselves.* This presumes that instances of abuse of any resident, whether cognizant or not, cause physical harm, pain, or mental anguish." (Emphasis added.) Medicare and Medicaid Programs, supra, 59 Fed. Reg. 56130. The

Health Care Financing Administration's express rejection of a subjective standard is instructive in interpreting our state statute and reinforces our understanding of § 20-102cc (a) as requiring an objective standard for assessing harm resulting from resident abuse.

A majority of the Appellate Court[14] reached the opposite conclusion in affirming the trial court's remand of the case for a determination as to whether Tschauder was adversely impacted by the alleged abuse. Although noting that "[o]ne of the main goals of our legislature in enacting Public Act 93-121 was to protect the 'frail elderly' " against acts of resident abuse; *Salmon* v. *Dept. of Public Health & Addiction Services*, supra, 58 Conn. App. 667; the Appellate Court was nonetheless persuaded to adopt a subjective standard of harm by comments made during a public hearing on the proposed act suggesting that "what constitutes abuse or neglect in any given situation is really a matter that's decided on a case-by-case basis . . . ." (Internal quotation marks omitted.) Id., 659 n.14. We are not persuaded.

Our determination that an objective standard is the appropriate test for measuring harm to a nursing home resident under § 20-102cc (a) recognizes that instances of abuse do not occur in a vacuum. Rather, each is defined by its own set of factual circumstances. It is with respect to these circumstances, namely, the particular context in which the alleged abuse occurs, that a determination of abuse is made on a case-by-case basis. To hold, as did the Appellate Court; id., 667; that the "case-by-case" determination referenced during the public hearing applies to the subjective state of mind of the resident victim would be inconsistent with the

---

[14] Judge Schaller dissented from the majority opinion on this issue, concluding that "an objective test for adverse impact would provide greater fairness and consistency for all parties involved in the process, residents and nurse's aides alike." *Salmon* v. *Dept. of Public Health & Addiction Services*, supra, 58 Conn. App. 672.

purpose of the legislature in enacting § 20-102cc (a). Indeed, the Appellate Court recognized this quandary when it conceded that "[i]t may be the case, in some situations, that an objective test would be more effective than a subjective test. For example, a factual scenario may be envisioned in which a comatose, unconscious or mentally disabled patient is . . . abused . . . . In such a situation, an objective test may be more appropriate." Id., 668. As previously discussed, however, this double standard has no support in the plain language of the statute or in the legislative history of either our state statute or the federal scheme it was designed to implement.

Because we conclude that a determination regarding harm to the resident should be made according to an objective standard, there is no need to remand the case to the department for further factual findings regarding this issue, as the trial court had ordered. The circumstances of this case can lead to only one logical conclusion, namely, that a reasonable, sentient and cognizant resident in Tschauder's position would have been adversely impacted by the plaintiff's conduct. There can be no doubt that such a resident, lying naked and exposed, would suffer some degree of emotional or psychological harm from a caregiver's repeated use of the term "pussy" while cleaning her genital area. Tschauder's own testimony before the department is illustrative: she indicated that she felt "naked and helpless" during the incident, and was very "embarrassed and upset." Given the factual scenario presented by this case, we can only conclude that the requirement that a resident be adversely impacted by a caregiver's conduct was satisfied. Accordingly, no remand is necessary. See *Adriani* v. *Commission on Human Rights & Opportunities*, 220 Conn. 307, 329 n.21, 596 A.2d 426 (1991), on appeal after remand, 228 Conn. 545, 636 A.2d 1360 (1994) ("when a trial court concludes that an adminis-

trative agency has made invalid or insufficient findings, the court must remand the case to the agency for further proceedings *if the evidence does not support only one conclusion as a matter of law*" [emphasis added]).

## II

Next, we turn to the first issue raised on the plaintiff's cross appeal, namely, whether the term "resident abuse" under § 20-102cc (a) requires an element of intent or wilfulness, and if so, the proper meaning of that term. The plaintiff contends, and the department concedes, that in order for one to have perpetrated abuse under the statute, he or she must have acted wilfully. We agree.

We first address the department's assertion that we should not review this claim because, as the Appellate Court concluded, the plaintiff failed to raise it before the trial court. *Salmon* v. *Dept. of Public Health & Addiction Services*, supra, 58 Conn. App. 662–63. Our review of the record, however, satisfies us that, although the plaintiff did not articulate her claim in the precise language of "wilfulness," the basis of her claim at both the department and trial court levels was that, in order to constitute resident abuse, there had to be some intentional or wilful conduct by the plaintiff-caregiver toward the victim that resulted in harm. We are persuaded that the plaintiff functionally raised this issue in the administrative and trial court proceedings. See *State* v. *Dabkowski*, 199 Conn. 193, 198, 506 A.2d 118 (1986) (although "[t]he formulation of these positions, as now made on appeal, were not articulated in that manner in the trial court . . . [t]he claims were functionally made"). Furthermore, the question of whether § 20-102cc (a) requires an element of wilfulness or intent is inextricably tied to our resolution of the sole issue raised on the department's appeal, namely, whether an objective or subjective test should be

applied in measuring the harm suffered by the resident patient as a result of alleged abuse by her caregiver.

Although it is not determinative, the term "abuse" in this context, namely, the abuse of a resident in a nursing home facility, strongly suggests that the infliction of harm be intentional or wilful, as opposed to inadvertent. This interpretation is buttressed by the serious consequences to the caregiver that result from a finding of resident abuse. See footnote 9 of this opinion. Construing § 20-102cc (a) to require an element of intent or wilfulness is also consistent with our interpretation of other state statutes concerning the care and protection of the elderly. See *Nancy G.* v. *Dept. of Children & Families*, 248 Conn. 672, 686, 733 A.2d 136 (1999) (since "[t]he legislature is presumed to exercise its statutory authority . . . with the intention of creating one consistent body of law . . . [a]n identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result" [internal quotation marks omitted]). Because General Statutes §§ 17b-450 and 17b-451 also deal with incidents of suspected abuse against the elderly, they inform our understanding of the term "abuse" as contained in § 20-102cc (a). Section 17b-451 requires health care workers to report incidents of abuse of the elderly to the commissioner of social services. Section 17b-450 (4), the attendant definitional section, provides: "Abuse includes, but is not limited to, the *wilful* infliction of physical pain, injury or mental anguish, or the *wilful* deprivation by a caretaker of services which are necessary to maintain physical and mental health. . . ." (Emphasis added.) Given that §§ 17b-450, 17b-451 and 20-102cc (a) share a common purpose, namely, the protection of the elderly, we conclude that the term "abuse" includes an element of wilfulness in both contexts.

The federal regulations enacting the Omnibus Budget Reconciliation Act amendments, promulgated by the Health Care Financing Administration, further support our conclusion that resident abuse under § 20-102cc (a) requires an element of wilfulness. These regulations specifically revised the original definition of "abuse" contained in 42 C.F.R. § 488.301 to read "[a]buse means the *willful* infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish." (Emphasis added.) See Medicare and Medicaid Programs, supra, 59 Fed. Reg. 56130. As the comments to the definitional section indicate, the proposed definition of abuse originally was thought by many to be "too broad and ambiguous." Id. In an effort to clarify this term, the Health Care Financing Administration adopted the suggestion to incorporate "[w]illfulness and/or deliberate intent" into the definition. Id. Because the federal scheme that § 20-102cc (a) was designed to implement includes an element of wilfulness, it follows that its state counterpart does as well.

Having determined that resident abuse under § 20-102cc (a) requires an element of wilfulness, we must define that term as used in the context of the particular statute at issue. The plaintiff advances a meaning of the term "wilful" that includes "a specific intent to inflict injury, unreasonable confinement, intimidation or punishment." The department argues, to the contrary, that the "wilful" component of resident abuse is satisfied when one "voluntarily engages in the act resulting in the abuse. Intent to harm or injure the victim is irrelevant." We agree with the definition proffered by the department.

The United States Court of Appeals for the District of Columbia recently decided a case that involved the same issue with which we presently are faced, on virtually identical facts. In *Hearns* v. *Dept. of Consumer &*

*Regulatory Affairs*, 704 A.2d 1181, 1182 (D.C. Cir. 1997), the petitioner, a certified nursing assistant, was alleged to have committed an act of violence against a nursing home resident in violation of 42 C.F.R. § 483.13 (1996). Specifically, the petitioner was accused of pulling a resident by the arm into her room and thereafter shaking her finger at the resident in a reprimanding manner. Id. The nursing home reported the petitioner to the District of Columbia Service Facility Regulation Administration (administration), the equivalent of the department in the present case, which found the allegations of abuse to be substantiated. Id., 1181–82. The administration then entered the petitioner's name into the abuse section of the nurse aide registry pursuant to the District of Columbia Municipal Regulations, 29 D.C. Mun. Regs. §§ 3252.6 and 3252.7 (1991). *Hearns* v. *Dept. of Consumer & Regulatory Affairs*, supra, 1182.

The petitioner thereafter appealed from the decision of the administration to the Court of Appeals, arguing that the government failed to prove that she had acted wilfully in accordance with the definition of abuse contained in 42 C.F.R. § 488.301 (1996). Id. In affirming the administration's decision, the Court of Appeals observed: "[T]he [p]etitioner argues that she did not intentionally ('willful[ly]') abuse the resident, but the regulation cannot reasonably be understood to mean that she must have acted with a 'bad purpose' (i.e., to abuse); rather, 'willful' in this regulatory context denotes a conscious decision to do the act which the law forbids. Cf. *Screws* v. *United States*, 325 U.S. 91, 101, 65 S. Ct. 1031, 1035, 89 L. Ed. 1495 (1945) (except in criminal context where 'willful' may require 'more . . . than the doing of the act proscribed by the statute,' [the] word commonly 'denotes an act which is intentional rather than accidental')." *Hearns* v. *Dept. of Consumer & Regulatory Affairs*, supra, 704 A.2d 1183.

We are persuaded by the reasoning of the District of Columbia Court of Appeals in *Hearns*, as it applies to the meaning of the term "resident abuse" in § 20-102cc (a). First, as the court in *Hearns* noted, an interpretation of wilfulness that requires a specific intent to harm is commonly reserved for the criminal law context—and not even uniformly then. See, e.g., *United States* v. *Schwartz*, 464 F.2d 499, 509 (2d Cir.), cert. denied, 409 U.S. 1009, 93 S. Ct. 443, 34 L. Ed. 2d 302 (1972) (wilful violation of federal securities law requires only wilfulness to commit act, rather than specific intent to knowingly violate law); *State* v. *Dennis*, 150 Conn. 245, 250–51, 188 A.2d 65 (1963) (where defendant charged with "wilfully or unlawfully" committing "certain acts likely to impair the morals of a minor child, contrary to [General Statutes] § 53-21 . . . [s]pecific intent is not an element of the crime defined" [citations omitted]). Second, the term must be regarded as embodying two counterbalancing elements: (1) adequate protection of the vulnerable resident from harmful conduct by a caregiver; and (2) adequate protection of the caregiver from serious, career and reputational harm that results from baseless allegations of abuse. We think that the statute strikes the balance between the two by requiring that the harmful conduct be intentional—in the sense of voluntary, as opposed to accidental or inadvertent— rather than requiring that it be accompanied by an evil intent. This meaning is also consistent with the overriding legislative purpose of protecting the frail and elderly in nursing homes. Therefore, we conclude that the wilfulness element of "resident abuse" requires that the conduct of a caregiver be voluntary, rather than accidental or inadvertent.

As with the sole issue presented by the department's appeal, we conclude that it is unnecessary to remand the case for a determination as to whether the plaintiff acted wilfully, as we have defined that term in the con-

text of § 20-102cc (a). There is no evidence to suggest that the plaintiff's repeated use of the term "pussy" while cleaning Tschauder's perineal area was either inadvertent or accidental. Moreover, it cannot be reasonably contended that the plaintiff's word choice under the circumstances was anything other than deliberate. We conclude, therefore, that the wilfulness element of the term "resident abuse" contained in § 20-102cc (a) was satisfied as a matter of law, thus vitiating the need for a remand. See *Adriani* v. *Commission on Human Rights & Opportunities*, supra, 220 Conn. 329 n.21.

The second issue raised by the plaintiff's cross appeal is whether the Appellate Court improperly affirmed the trial court's refusal to remand the case to the department, pursuant to § 4-183 (h),[15] for the taking of additional evidence. In this court, the plaintiff argues that the additional evidence she sought to introduce satisfied the standard for a remand under § 4-183 (h) in that it was material, and there were good reasons for her failure to present it initially to the department.[16] The

[15] General Statutes § 4-183 (h) provides: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court may order that the additional evidence be taken before the agency upon conditions determined by the court. The agency may modify its findings and decision by reason of the additional evidence and shall file that evidence and any modifications, new findings, or decisions with the reviewing court."

[16] The plaintiff also contends that the Appellate Court applied the wrong standard in reviewing the trial court's denial of her motion for a remand pursuant to § 4-183 (h). Instead of deciding whether there were good reasons for her failure to present the additional evidence before the department, the Appellate Court observed that "only when [the administrative] record fails to present the hearing in a manner sufficient for the determination of the merits of the appeal, or when some extraordinary reason requires it, should the court hear evidence." (Internal quotation marks omitted.) *Salmon* v. *Dept. of Public Health & Addiction Services*, supra, 58 Conn. App. 664, quoting *Tarasovic* v. *Zoning Commission*, 147 Conn. 65, 69, 157 A.2d 103 (1959). The plaintiff argues that this standard is only applicable where a

plaintiff thus maintains that the trial court abused its discretion in denying her motion. The department argues that the plaintiff failed to satisfy the statutory standard for a remand, and that the trial court acted within its discretion in denying the plaintiff's motion. We agree with the plaintiff and, accordingly, we remand the case to the department for the taking of the additional evidence the plaintiff sought to present in her motion. We emphasize, however, that the weight to be afforded such evidence and its overall effect on the original determination of resident abuse are matters left to the discretion of the department in the exercise of its fact-finding function.

The following additional facts are relevant to our resolution of this issue. Before oral argument in the trial court, the plaintiff moved for a remand to the department in order to present evidence to the effect that: "(1) . . . Tschauder had testified falsely; (2) . . . the testimony of Shelton Lake's employees was unreliable because of their bias against the plaintiff; and (3) [Tschauder was not a credible witness, as evidenced by her] medical and psychological records, expert testimony concerning the effect of her conditions on her reliability, and testimony of other caretakers concerning . . . Tschauder's conditions and behavior, including her consistent, strong dislike of incontinen[t] care and her pattern of verbalizing sexual fantasies."

To demonstrate that Tschauder's allegations and testimony had been fabricated, the plaintiff offered the

party seeks to present additional evidence before the trial court during the course of an administrative appeal; it overstates her burden with respect to demonstrating the necessity of a remand to the department. We agree that the language quoted from *Tarasovic* provides the incorrect standard of review regarding a motion for remand brought under § 4-183 (h). The correct standard is set forth in the statute itself: the trial court may remand the case to the agency for the taking of additional evidence upon a showing that: (1) such evidence is material; and (2) there existed good reasons for not presenting it at the initial agency proceeding.

affidavit of Dolores Brown, a nurse's aide at Shelton Lakes assigned to care for Tschauder. According to the affidavit,[17] toward the end of Brown's employment at Shelton Lakes, Tschauder confessed that the incident with the plaintiff never occurred, and that the staff had used her to sabotage the plaintiff and have her fired. Tschauder further stated that she had never revealed the truth before because she was afraid that if she did, she would be forced to leave the Shelton Lakes facility. The plaintiff argued that Brown's affidavit attesting to Tschauder's recantation was material and that it was not presented to the department originally because it was only recently discovered in connection with the plaintiff's federal discrimination action against Shelton Lakes.

---

[17] Brown's affidavit, dated March 10, 1997, provides as follows: "The undersigned Dolores Brown, a/k/a Lois Brown, being duly sworn, hereby deposes and says:

"1. I am over the age of eighteen (18) years and understand and believe in the obligations of an oath.

"2. I reside in . . . Connecticut and maintain a mailing address of . . . .

"3. I was employed as a nurse's aide at Shelton Lakes Residence & Health Care Center until July 1995.

"4. I have never met [the plaintiff]. We were employed at Shelton Lakes at different times.

"5. I am of Jamaican origin.

"6. I was assigned to care for a patient named Vivian Tschauder and over time she came to trust and confide in me.

"7. I was told by other nurse's aides and later by Ms. Tschauder that she had accused [the plaintiff] of sexually abusing her and they had fired her.

"8. One night I had a disagreement with a nurse's aide named Diane Thorpe about an assignment. She reminded me that they had gotten rid of another Jamaican nurse's aide. By the tone of her voice I took her to be threatening that if she didn't get her way, I could be set up and fired too.

"9. Towards the end of my employment at Shelton Lakes, Ms. Tschauder confided to me that the abuse never happened and that they had used her to set-up [the plaintiff]. She told me she was sorry for what she did but was afraid that if they knew she told anybody, that they wouldn't let her stay there anymore.

"10. I have made this affidavit at the request of [the plaintiff's] attorney to present the truth and for no other reason.

/s/ Dolores Brown"

In an effort to discredit the testimony of the staff from Shelton Lakes, the plaintiff also sought to present evidence of racial animus. Specifically, she referred to allegations contained in her federal discrimination complaint against Shelton Lakes that offered a motive for the staff to contrive the charge of resident abuse arising from her supposed encounter with Tschauder. According to the plaintiff's complaint, approximately one month before she was terminated, she had applied for a scholarship offered by Shelton Lakes to assist nurse's aides in attending nursing school. The plaintiff alleged that she was the only Jamaican and only black person who applied for the scholarship, which she was, in fact, qualified to receive. The plaintiff further alleged that Shelton Lakes employed no black nurses, and only a handful of black nurse's aides. Finally, the complaint stated that shortly after inquiring into the status of her application, the plaintiff was wrongfully discharged for the alleged sexual abuse of Tschauder, just one week before the scholarships were awarded. According to the plaintiff's motion, this evidence revealed the motivation of the Shelton Lakes staff in making and perpetuating false charges against her and should properly be considered by the department.

The plaintiff asserted that this evidence had not been presented at the administrative hearing because the plaintiff's previous attorney had failed to defend her adequately against the charge of resident abuse by attacking the credibility of the witnesses against her. In support of her assertion that the ineffective assistance of her attorney constituted a "good reason" for purposes of § 4-183 (h), the plaintiff referred to a proposed decision of the statewide grievance committee, which, after holding a hearing regarding the conduct of her attorney, recommended that he be reprimanded, since his "level of competency [in representing the plaintiff] fell below professional standards."

The plaintiff also sought to produce evidence to the department regarding Tschauder's overall health that would tend further to undermine her testimony. This evidence, according to the plaintiff's motion, would consist of medical records, expert testimony, and the testimony of certain caregivers relating to her physical and psychological conditions, especially her alleged resistance to incontinent care and pattern of sexual fantasies. The plaintiff argued that this evidence was material because it undermined the reliability of Tschauder's testimony, which the hearing officer had credited over that of the plaintiff. The plaintiff also argued that this evidence had not been presented previously because: (1) it was only then recently discovered in connection with her federal discrimination action against Shelton Lakes; and (2) her previous attorney had failed to provide her with a proper defense.

The trial court heard argument on the motion in conjunction with the merits of the plaintiff's appeal, and, in a separate ruling, denied the plaintiff's motion. The court reasoned that, although "most of the proposed evidence [was] material to the issues in dispute," the plaintiff nonetheless did not show good reasons for her failure to present it to the department, as she was required to do pursuant to § 4-183 (h). See footnotes 15 and 16 of this opinion.

The trial court discredited the plaintiff's argument that the evidence was newly discovered, finding that "[t]here [was] nothing in the plaintiff's motion to show that the evidence could not have been presented to the department at the [initial] proceeding." The court also rejected the plaintiff's argument that the evidence had not been originally offered before the department because of her attorney's incompetence, noting that it could not "find that as a matter of law ineffective assistance of counsel before an administrative agency constitutes a good reason under General Statutes § 4-

183 (h). There is no right to effective assistance of counsel in a civil proceeding." Lastly, with respect to Brown's affidavit, the court found "that in light of the passage of time this proffered evidence is not material." The court pointed out that the affidavit was made almost four years after the incident between the plaintiff and Tschauder had occurred, and noted that the plaintiff had failed to demonstrate that this evidence had not been available at the time of the department hearing.

We begin by briefly setting forth the standard by which we review the plaintiff's claim. Section 4-183 (h) provides: "If, before the date set for hearing on the merits of an appeal, application is made to the court for leave to present additional evidence, and it is shown to the satisfaction of the court that the additional evidence is material and that there were good reasons for failure to present it in the proceeding before the agency, the court *may order* that the additional evidence be taken before the agency upon conditions determined by the court. . . ." (Emphasis added.) Ordinarily, the term "may" acts as a grant of permissive authority, rather than as a directive, suggesting that a trial court has discretion regarding whether to grant or deny a motion brought pursuant to the statute. See *Commission on Human Rights & Opportunities* v. *Truelove & Maclean, Inc.*, 238 Conn. 337, 349, 680 A.2d 1261 (1996) ("The word 'may,' unless the context in which it is employed requires otherwise, ordinarily does not connote a command. Rather, the word generally imports permissive conduct and the conferral of discretion."). We conclude, therefore, as the parties agree, that we review the trial court's decision in the present case for an abuse of discretion.

As the trial court acknowledged, in order for the plaintiff to obtain a remand to the department for the taking of additional evidence, she had to demonstrate that: (1) the proffered evidence was material; and (2)

there were good reasons for her failure to present it at the department hearing. We address the plaintiff's proof with respect to these standards in turn.

First, as previously stated, the trial court found most of the evidence offered by the plaintiff to be material. The only piece of evidence with which the trial court took issue in this regard was Brown's affidavit. Relying solely on the fact that the affidavit had been made in 1997, almost four years after the incident between the plaintiff and Tschauder, the court found "that in light of the passage of time this proffered evidence is not material." That finding, however, misconstrues the meaning of the term "material evidence."

It is axiomatic that "[e]vidence is admissible only to prove material facts, that is to say, those facts directly in issue or those probative of matters in issue; evidence offered to prove other facts is 'immaterial.' " C. Tait, Connecticut Evidence (3d Ed. 2001) § 4.1.3, p. 200, citing *Adams* v. *Way*, 32 Conn. 160, 167–69 (1864). Because Brown's affidavit attesting to Tschauder's recantation would tend to prove or disprove the ultimate contested fact in this case, namely, whether the alleged incident actually occurred, it is difficult to see how this evidence would be immaterial. This is especially true in light of the hearing officer's critical finding that Tschauder was a more credible witness than the plaintiff. That finding was based largely on the absence of any motive for Tschauder to testify falsely, a motive that Brown's affidavit supplies.[18]

Moreover, contrary to the conclusion of the trial court, the passage of time between the incident and

[18] The hearing officer explicitly stated that he found "Tschauder's testimony more credible . . . [because] [s]he [had] nothing to gain by fabricating a story, as the [plaintiff's] attorney suggested she was doing." The officer also noted that Tschauder "was consistent in the main points of her testimony on both direct and cross-examinations."

the making of the affidavit did not affect its materiality. That factor should not have prevented the court from finding that the affidavit and recantation satisfied the standard for a remand under § 4-183 (h); rather, it is something most appropriately considered by the department, in the first instance, in determining how much weight to afford the affidavit in the event of a remand. We therefore conclude that the trial court abused its discretion in failing to credit Brown's affidavit and Tschauder's recantation as material.[19]

The department argues that, because the trial court has broad discretion in determining the admissibility of evidence, and because recantation evidence is usually disfavored as grounds for granting a new trial, the trial court in the present case did not abuse its discretion in failing to find that Brown's affidavit was material.[20]

---

[19] In her motion for a remand pursuant to § 4-183 (h), the plaintiff notes that "[a]lthough the [department], through its counsel, was made aware of [Brown's affidavit attesting to Tschauder's recantation], the [department] has failed to reconsider its finding against [the plaintiff]." This fact, however, does not require that we affirm the trial court's denial of the plaintiff's motion, for two reasons. First, the department rendered its final decision in 1995, and therefore would most likely have been without authority to reconsider its findings in light of this new evidence absent a remand order from the trial court pursuant to § 4-183 (h). Second, the weight of this evidence alone is not at issue; rather, had the trial court granted the plaintiff's motion, the department would have had an opportunity to reconsider its finding of abuse in light of the cumulative evidence that the plaintiff sought to present, namely, Tschauder's recantation, racial biases allegedly harbored by the Shelton Lakes staff that supply a motive consistent with the recantation, and expert testimony concerning Tschauder's physical and mental health. Thus, the fact that Brown's affidavit, taken alone, might not have persuaded the department to reach a different conclusion is not determinative.

[20] The department also argues that, because Tschauder had passed away in the interim between the incident and the affidavit, her recantation would be inadmissible hearsay, and the trial court thus acted within its discretion in failing to remand such evidence to the department. In advocating for this position, however, the department fails to recognize that "administrative tribunals are not strictly bound by the rules of evidence and . . . may consider evidence which would normally be incompetent in a judicial proceeding . . . ." *Jutkowitz* v. *Dept. of Health Services*, 220 Conn. 86, 108,

That argument, however, is flawed for two fundamental reasons. First, although it may be true that, in a trial, the court is vested with broad discretion regarding the admissibility of evidence, that discretion does not factor into its role as an appellate body acting within the framework of § 4-183 (h). When a party moves for a remand in order to present additional evidence before an administrative agency pursuant to the statute, the trial court's role is limited to determining whether (1) the evidence is material, and (2) there existed good reasons for not presenting such evidence before the administrative agency originally. The trial court is not asked to decide whether the evidence would be admissible in the normal course of a judicial proceeding, nor is it required to determine whether the evidence would be admissible before itself in the course of the administrative appeal. Indeed, the trial court is not even asked to decide whether the evidence will be admissible before the *agency* upon remand; such analysis becomes subsumed within the court's finding that the additional evidence is material, given the more relaxed standard for admissibility contained in the UAPA. See footnote 20 of this opinion and the discussion that follows. Thus, the department's reference to the broad discretion of the trial court is misplaced in this context.

The second problem with the department's analysis lies in its attempt to analogize a petition for a new trial based on recantation evidence to the present motion. The department points out that new trials are rarely granted on the basis of recantation evidence because of its purported inherent unreliability. The department's analysis, however, misses the mark. First, the requested

596 A.2d 374 (1991). Furthermore, the department ignores our conclusion in *Jutkowitz* that even hearsay evidence, replete with its inherent untrustworthiness, may be considered in an administrative hearing. See id. In light of the lower standard for admissibility applicable in agency proceedings, the department's argument is without merit.

remand in the present case is different from a petition for a new trial. When a party moves to offer additional evidence before the agency pursuant to § 4-183 (h), it is not requesting a new hearing, but rather an opportunity to supplement the record with evidence that originally was unavailable. Furthermore, a court order granting such a motion does not vitiate the department's original decision, but instead permits the department to consider new evidence and to modify its decision as necessary. Thus, a remand under § 4-183 (h) does not offer the parties an opportunity to relitigate the case ab initio, but rather represents a continuation of the original agency proceeding. See *Raines* v. *Freedom of Information Commission*, 222 Conn. 482, 489, 604 A.2d 819 (1992) (remand for taking of additional evidence does not constitute separate and distinct proceeding, unlike new trial or retrial). For purposes of the plaintiff's motion, therefore, the standards for granting a petition for a new trial are not controlling.

Second, the standard for reliability of the evidence in a judicial proceeding varies from that which governs hearings before administrative agencies. As previously discussed, the rules of evidence do not apply in administrative hearings. Rather, agencies may receive "*[a]ny* oral or documentary evidence [that is not] . . . irrelevant, immaterial or unduly repetitious . . . ." (Emphasis added.) General Statutes § 4-178 (1). Thus, the degree of reliability required of evidence offered before an administrative agency is lower than that deemed necessary for the same evidence to be received by a court. The fact that recantation evidence may not be admitted or credited by a court, therefore, does not preclude its consideration by an agency.

We next turn to the second factor that the trial court must consider in deciding whether to grant a motion brought pursuant to § 4-183 (h), namely, whether the party requesting the remand has shown good reason

why the additional evidence was not presented at the original agency proceeding. With respect to this factor, the plaintiff offered two arguments before the trial court. First, the plaintiff claimed that Tschauder's recantation, as testified to in Brown's affidavit, was newly discovered and therefore unavailable at the time of the department hearing. Second, with respect to the evidence concerning the credibility of both Tschauder and the staff at Shelton Lakes, the plaintiff argued that the evidence was newly discovered in connection with her discrimination action against Shelton Lakes, and that such evidence would have been uncovered at the department hearing but for the incompetence of her attorney. The trial court determined that the reasons offered by the plaintiff did not meet the standard contained in § 4-183 (h). We disagree.

In ruling on Brown's affidavit, the trial court found that the plaintiff had failed to demonstrate that this testimony was unavailable at the time of the department hearing. The court noted that "[t]he affidavit does not indicate when the affiant began her employment at Shelton Lakes," and that "[t]he affiant simply avers that it was subsequent to the plaintiff's employment there." This lack of factual specificity, however, is not fatal to the plaintiff's cause. Our review of the affidavit and its contents in light of the entire record discloses that Brown's testimony would not have been available at the department proceeding, as the plaintiff suggests. According to Brown's affidavit, she was employed as a nurse's aide at Shelton Lakes until July, 1995. Toward the end of her employment there, Brown swore, Tschauder confided that the alleged incident involving the plaintiff never occurred, and that the staff at Shelton Lakes had used Tschauder to get rid of the plaintiff. In her affidavit, Brown also stated that Tschauder indicated her reluctance to tell the truth about what had

happened for fear that, if she did, the staff at Shelton Lakes would force her to leave.

The hearing before the department was held in December, 1994, and a final decision was issued on April 24, 1995. Tschauder did not recant the testimony she gave at the hearing until months later, prior to Brown's ending her employment at Shelton Lakes in July, 1995. Furthermore, Brown did not come forward with this information until March, 1997, more than three years after the hearing and almost two years after the department rendered its final decision. It therefore stands to reason that Brown's affidavit and Tschauder's recantation would not have been available at the time the department conducted its inquiry into the allegations of abuse charged against the plaintiff.

Regarding the evidence that the plaintiff sought to introduce that would tend to discredit the testimony of both Tschauder and the staff from Shelton Lakes, the trial court again determined that "[t]here is nothing in the plaintiff's motion to show that the evidence could not have been presented to the department . . . ." In making this determination, however, the trial court disregarded the plaintiff's assertion that certain of the evidence dealing with Tschauder's medical and emotional conditions was newly discovered. According to the plaintiff's motion, Tschauder's caregivers were not forthcoming with the information until after the department hearing, during the course of the plaintiff's discrimination complaint against Shelton Lakes.[21] This evidence would not have been available, therefore, in the initial proceedings before the department. By failing

---

[21] The plaintiff's motion states that "evidence from other caretakers was only *recently* discovered by [the] plaintiff's present counsel in the course of an investigation in connection with [the plaintiff's] pending federal court discrimination action." (Emphasis added.) The plaintiff's motion is dated January 13, 1998, almost three years after the close of department proceedings in this case.

to credit the timing of these events, the trial court improperly determined that the plaintiff had not shown good reason why the evidence was not presented to the department.

The trial court also improperly disregarded the plaintiff's argument that much of the evidence regarding witness credibility was not produced at the department proceedings due to the incompetence of her attorney. Despite evidence that the statewide grievance committee, in a proposed decision,[22] recommended sanctioning the plaintiff's attorney for his failure to defend her properly against the charge of resident abuse, the court reasoned that since "[t]here is no right to effective assistance of counsel in a civil proceeding," a claim of ineffective assistance cannot amount to a "good reason" under § 4-183 (h) as a matter of law. We disagree with this analysis.

Although the trial court is correct in its assertion that, generally, one is not constitutionally entitled to effective assistance of counsel in a civil matter, that rule does not preclude a determination that the incompetence of one's attorney is a valid reason for failing to present evidence during an administrative proceeding. Case law supports the notion of vacating a prior court decision on the basis of gross neglect by a party's attorney, even in the absence of a viable claim of ineffective assistance of counsel. See, e.g., *Boughner* v. *Secretary of Health, Education & Welfare*, 572 F.2d 976 (3d Cir. 1978) (trial court improperly denied motion under rule 60 [b] [6] of Federal Rules of Civil Procedure to vacate award of summary judgment where appellants' original counsel failed to oppose request for summary judgment

---

[22] The fact that the decision of the statewide grievance committee was proposed rather than final does not undermine the presumptive validity of the plaintiff's claim that the ineffective representation afforded by her attorney was one of the reasons for her failure to present the additional evidence at the department hearing.

and it was determined that counsel had failed to file responsive pleading in fifty-two other similar cases; counsel's conduct amounted to inexcusable neglect and was "exceptional circumstance" warranting relief under rule 60 [b] [6]); *United States* v. *Cirami*, 563 F.2d 26 (2d Cir. 1977) (trial court improperly denied motion under rule 60 [b] [6] of Federal Rules of Civil Procedure to vacate final judgment entered against appellants for unpaid taxes where counsel had failed to oppose motion for summary judgment and it was determined that his neglect resulted from mental disorder that prevented him from completing work; court also noted that bar association charges had been brought against counsel regarding his inability to perform his duties adequately). The assertions regarding attorney incompetence in both *Boughner* and *Cirami* were sufficient to satisfy rule 60 (b) (6) of the Federal Rules of Civil Procedure, which "provides an extraordinary remedy and may be invoked only upon a showing of exceptional circumstances" or " 'extreme' . . . hardship . . . ." *Boughner* v. *Secretary of Health, Education & Welfare*, supra, 978. This standard is higher than that required by § 4-183 (h), namely, that the movant must demonstrate "good reasons" why the additional evidence was not produced before the administrative agency. Accordingly, proof that one's attorney provided incompetent representation during the course of department proceedings may constitute a showing of a "good reason" for purposes of the statute at issue.

We draw further support for our conclusion from the nature of the proceedings at issue. As previously stated, hearings before an administrative agency are unlike those before a court of law; they are more flexible and informal. Section 4-183 (h) must be understood against this backdrop as a tool for supplementing the record in circumstances where the requirements of the statute have been met.

Having reviewed the record, we conclude that the plaintiff sufficiently demonstrated that her original attorney provided her with ineffective representation so as to contribute to a determination of good cause under § 4-183 (h). The statewide grievance committee, after conducting a hearing regarding the representation afforded by the plaintiff's attorney in this case, preliminarily concluded that the attorney "did not provide competent legal advice to the [plaintiff] in the patient abuse claim against her . . . . The [attorney] failed to adequately prepare and present a defense to the charges against the [plaintiff] at the December 19, 1994 hearing and neglected to adequately pursue an appeal on her behalf in violation of rules 1.1 and 1.3 of the Rules of Professional Conduct. The [attorney] also failed to adequately communicate with the [plaintiff] about the status of her matters so that she could make reasonable decisions about the quality of the [attorney's] legal representation, in violation of rule 1.4 of the Rules of Professional Conduct." This evidence supports the determination that, on the facts of this case, attorney incompetence may form part of the basis of a "good reason" for purposes of § 4-183 (h).

Our thorough review of the record thus satisfies us that the trial court improperly denied the plaintiff's motion. The case, therefore, must be remanded to the department for the taking of the additional evidence the plaintiff sought to present, in accordance with § 4-183 (h).

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court, and to direct that court to remand the case to the department for further proceedings.

In this opinion the other justices concurred.