******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

PATRICK T. MCMAHON *v.* CITY OF
MIDDLETOWN ET AL.
(AC 38678)

DiPentima, C. J., and Elgo and Bear, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant city of Middle-
town for breach of an employment contract and breach of the implied
covenant of good faith and fair dealing in connection with the allegedly
wrongful termination of his employment as the defendant's deputy chief
of police without just cause. During the plaintiff's direct examination
of four witnesses at trial, the plaintiff's counsel requested the court's
permission to ask leading questions, which the court denied as to three
of the witnesses. Thereafter, the trial court rendered judgment for the
city, from which the plaintiff appealed to this court. *Held* that this court
declined to review the plaintiff's claim that the trial court violated statute
(§ 52-178) when it denied his counsel permission to ask leading questions
of the three allegedly adverse parties on direct examination, the plaintiff
having failed to preserve the claim by raising it at trial; the plaintiff
conceded that he did not specifically direct the trial court to § 52-178
but claimed that his requests to ask leading questions "functionally
raised" the issue, and although our appellate courts occasionally have
reviewed a claim that a party did not explicitly raise to the trial court
if it was clear from the record that the substance of the claim was
raised, the record here clearly indicated that the plaintiff did not raise,
functionally or otherwise, the substance of the claim made on appeal,
as the plaintiff's counsel did not argue at trial, as on appeal, that § 52-
178 mandated that the court permit leading questions during the direct
examination of an adverse witness in every instance and, instead,
requested the court's permission to ask leading questions of the three
witnesses, and when such permission was not forthcoming, the plaintiff's
counsel mounted no challenge to the court's rulings and made no proffer
as to the testimony that the leading questions might have elicited.

Argued November 27, 2017—officially released April 17, 2018

*Procedural History*

Action to recover damages for, inter alia, breach of
an employment contract, and for other relief, brought
to the Superior Court in the judicial district of New
London at Norwich and transferred to the Superior
Court in the judicial district of New London, where the
action was withdrawn as against the defendant Eric P.
Daigle; thereafter, the matter was tried to the court,
*Hon. Joseph Q. Koletsky*, judge trial referee; judgment
for the defendant city of Middletown, from which the
plaintiff appealed to this court. *Affirmed.*

*Richard Padykula*, with whom, on the brief, was
*Leon M. Rosenblatt*, for the appellant (plaintiff).

*Michael J. Rose*, with whom was *Cindy M. Cieslak*,
for the appellee (named defendant).

*Opinion*

DiPENTIMA, C. J. The plaintiff, Patrick T. McMahon, appeals from the judgment of the trial court rendered in favor of the defendant city of Middletown (city).[1] On appeal, the plaintiff claims that the court contravened General Statutes § 52-178[2] by denying his counsel's[3] requests to ask leading questions during the direct examination of the city's mayor, former mayor, and former acting deputy police chief. We decline to review this unpreserved claim and, accordingly, affirm the judgment of the trial court.

The following facts and procedural history are relevant. In October, 2007, the plaintiff was hired by the city to be its deputy chief of police. That position was classified in the personnel rules as a "Defined, Non-Bargaining Position," meaning that the city must have "just cause" to terminate employment.

In July, 2009, the city's chief of police retired, and then mayor, Sebastian Giuliano, appointed the plaintiff to the position of acting chief. In October, 2010, Giuliano nominated the plaintiff for permanent appointment as chief of police but the city's common council voted against the nomination. Giuliano nevertheless continued to support the plaintiff's nomination, which the council again rejected in January, 2011. Thereafter, a group of citizens successfully petitioned to put the plaintiff's nomination on the November, 2011 ballot. Giuliano maintained his support for the plaintiff, who remained acting chief.

In early October, 2011, an anonymous comment on the website of a local newspaper, the Middletown Press, stated that on Thursday, September 29, 2011, the plaintiff was seen consuming alcoholic beverages in public while armed and in uniform. Shortly after this comment appeared, a reporter from the Middletown Press called the police department concerning the comment. After the ensuing holiday weekend, on Tuesday, October 11, 2011, the acting deputy chief, William McKenna, told the plaintiff of both the comment and the reporter's most recent phone call. The plaintiff was "aggravated" to learn of "these rumors," and immediately called the Middletown Press from McKenna's office while McKenna was present and listening. The plaintiff spoke first to the reporter who had called the police station, and then to the editor, Viktoria Sundqvist. The plaintiff told Sundqvist that the allegation was not true; he was not in uniform at the time and he had consumed "a club soda and lime, but [he's] sure [he] wasn't drinking [alcohol]."

After speaking with Sundqvist, the plaintiff, while still in McKenna's office, called Giuliano. Giuliano's administrative assistant, William Pillarella, listened to the call on speakerphone. At trial, the plaintiff testified that the conversation proceeded as follows: "Just directly,

I said, Mayor I'm giving you a call because I just spoke to the editor of the Middletown Press. There were some blogs about me drinking [alcohol] on duty in uniform . . . at a party at Mezzo Grille. I said I spoke to her and I wanted to give you the heads up in case you hadn't heard anything about that. He said no, I hadn't heard anything. . . . Mayor, it wasn't a party I was at Mezzo [Grille]. I was off duty, I was in civilian clothes, I had a badge and gun on, it was a gathering of sorts for firefighters because—he knew that a firefighter had lost his girlfriend. I said I bought a round of drinks, and I probably had a club soda and lime. I remember saying that I probably had a club soda and lime because his aide, whose voice I recognized on his phone, said wine? I said no; la-la-la-lime, accentuating the word lime because he thought I said wine." Giuliano testified that he believed the plaintiff was telling the truth during their phone call.

McKenna, however, was concerned that the plaintiff's statements to Sundqvist and Giuliano were not true. After listening to the call to Giuliano, McKenna stated to the plaintiff that he had seen him drinking at the Mezzo Grille and that while McKenna could not be certain whether the plaintiff had been "in uniform," the plaintiff nevertheless may have violated a police department rule.[4] On October 14, 2011, McKenna contacted Giuliano and Pillarella to inform them of his concerns about the veracity of the plaintiff's statements. Later that same day, two representatives from the police union met with Giuliano and the city's personnel director, Debra Milardo, to express their own concerns about statements the plaintiff had made to union members at a recent meeting to which he had been invited. Eventually, Giuliano came to believe that the plaintiff had demonstrated a serious lapse in judgment by failing to provide Giuliano with all of the relevant information. After consulting further with Milardo and others, Giuliano informed the plaintiff that he would be withdrawing his support for his nomination, returning him to the position of deputy chief, placing him on administrative leave, and opening an investigation into his conduct.

At McKenna's suggestion, the city ultimately hired Attorney Eric P. Daigle to conduct the investigation. While the investigation was ongoing, in November, 2011, Daniel Drew defeated Giuliano in the city's mayoral election. During his campaign, Drew had made a political issue of the plaintiff's appointment.

On February 17, 2012, Daigle submitted his report. He had interviewed thirty witnesses, half of whom reported seeing the plaintiff drinking alcohol in public while wearing his badge and sidearm on various occasions, including at the Mezzo Grille on September 29, 2011. Daigle concluded that the plaintiff had indeed consumed alcohol at the Mezzo Grille while wearing a badge and a sidearm. While it was unclear whether

this in and of itself violated any of the relevant police department rules, Daigle concluded that the plaintiff nevertheless had given false and misleading statements and had committed conduct unbecoming a police officer.

On the same day that the report was released, Drew sent the plaintiff a letter notifying him that the city would hold a hearing pursuant to *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 538–46, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (*Loudermill*), to determine whether just cause existed to terminate the plaintiff's employment. In addition to the violations Daigle had reported, Drew charged the plaintiff with threatening city employees during a press conference, misleading the press by claiming not to have been drinking alcohol and being insubordinate because he attended a training session while on administrative leave.

At the *Loudermill* hearing, when given the opportunity to present mitigating evidence, the plaintiff read a lengthy statement in his defense, after which Drew immediately terminated the plaintiff's employment. The plaintiff's attorney objected to the alacrity with which Drew acted, claiming that it was evidence of a predetermined outcome. Drew did not reconsider, and the plaintiff's employment was terminated.

On December 6, 2012, the plaintiff brought an action against the city for (1) breach of contract on the ground that he had been terminated without just cause and (2) breach of the covenant of good faith and fair dealing. The bench trial commenced on November 12, 2015, and after the plaintiff testified, he called Milardo, Giuliano, Drew and McKenna as witnesses. During the direct examination of each of those witnesses, counsel for the plaintiff requested the court's permission to ask leading questions as if on cross-examination. The court granted this request with respect to Milardo[5] but denied subsequent requests as to Giuliano, Drew and McKenna.[6] The court ultimately rendered judgment for the city, finding that the plaintiff had consumed alcohol at the Mezzo Grille while wearing a badge and sidearm and that the plaintiff deliberately had lied about doing so to Giuliano and others.[7] The court concluded that this was just cause for the termination of the plaintiff's employment. The plaintiff appealed.

The plaintiff's sole claim on appeal is that the trial court violated § 52-178 by denying his counsel permission to ask leading questions of Giuliano, Drew and McKenna on direct examination. Specifically, the plaintiff argues that § 52-178 requires a trial court to permit leading questions during the direct examination of a party opponent and its agents and employees; see footnote 2 of this opinion; and that the court's refusal to do so was harmful to his case. The city argues, inter alia, that the plaintiff failed to preserve this claim. We agree with the city.

"Our rules of practice require that a party 'intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief . . . or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. . . .' Practice Book § 5-2." *Adamo* v. *Adamo*, 123 Conn. App. 38, 45–46, 1 A.3d 221, cert. denied, 298 Conn. 916, 4 A.3d 830 (2010). "It is well established that an appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. See Practice Book § 60-5 . . . . The requirement that [a] claim be raised distinctly means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . We repeatedly have held that [a] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . . We will not promote a Kafkaesque academic test by which [a trial judge] may be determined on appeal to have failed because of questions never asked of [him] or issues never clearly presented to [him]." (Citations omitted; emphasis in original; internal quotation marks omitted.) *DiGiuseppe* v. *DiGiuseppe*, 174 Conn. App. 855, 864, 167 A.3d 411 (2017); see also *Burnham* v. *Karl & Gelb, P.C.*, 252 Conn. 153, 170–71, 745 A.2d 178 (2000). "These requirements are not simply formalities." (Internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 620, 99 A.3d 1079 (2014). "The reason for the rule is obvious: to permit a party to raise a claim on appeal that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Internal quotation marks omitted.) *Chief Disciplinary Counsel* v. *Rozbicki*, 326 Conn. 686, 695, 167 A.3d 351 (2017).

The plaintiff concedes that he did not specifically direct the trial court to § 52-178 but argues that his requests to ask leading questions "functionally raised" the issue.[8] It is true that our appellate courts occasionally have "expressed a willingness to review claims that a party did not explicitly raise to the trial court if it is clear from the record that the substance of the claim was raised." *State* v. *Santana*, 313 Conn. 461, 467, 97 A.3d 963 (2014); see also *Fadner* v. *Commissioner of Revenue Services*, 281 Conn. 719, 729 n.12, 917 A.2d 540 (2007); *Salmon* v. *Dept. of Public Health & Addiction Services*, 259 Conn. 288, 305, 788 A.2d 1199 (2002); *State* v. *Munoz*, 233 Conn. 106, 119 n.7, 659 A.2d 683 (1995); *State* v. *Dabkowski*, 199 Conn. 193, 198, 506 A.2d 118 (1986). We sometimes review such claims because, "although a party need not use the term of art applicable to the claim, or cite to a particular statutory provision or rule of practice to functionally preserve a claim, he

or she must have argued the underlying principles or rules at the trial court level in order to obtain appellate review." *State* v. *Santana*, supra, 468. Ordinarily, our appellate courts review claims that are functionally raised "only when a similar claim was raised in the trial court and the record was adequate to review the claim." *State* v. *Misenti*, 112 Conn. App. 562, 567, 963 A.2d 696, cert. denied, 291 Conn. 904, 967 A.2d 1220 (2009).

In the present case, the record clearly indicates that the plaintiff did not raise, functionally or otherwise, the substance of the claim he now makes on appeal. Four times over the span of a six day trial, the plaintiff's counsel requested the court's permission to ask leading questions. The court denied those requests with respect to Giuliano, Drew and McKenna.[9] At each denial, the plaintiff's counsel merely accepted the court's rulings and proceeded with direct examination. See footnote 7 of this opinion. The plaintiff's counsel did not argue, as on appeal, that there was an absolute right to ask leading questions pursuant to § 52-178. Instead, at trial, the plaintiff's counsel requested the court's permission to ask leading questions of three different witnesses, in addition to Milardo, and when such permission was not forthcoming as to those three witnesses, the plaintiff's counsel mounted no challenge to the rulings and made no proffer as to the testimony that leading questions might elicit. Although the trial court twice offered to reconsider its ruling if the plaintiff's counsel experienced difficulties examining the witnesses, no such request for reconsideration was made.[10] See *White* v. *Mazda Motors of America, Inc.*, supra, 313 Conn. 631 ("an issue must be distinctly raised before the trial court, not just briefly suggested" [internal quotation marks omitted]). In the present case, the plaintiff did not reach the threshold of briefly suggesting, let alone actually arguing, that he had a right to ask leading questions pursuant to § 52-178; neither the claimed right nor the statute itself were mentioned at any time during the trial.

On appeal, however, the plaintiff contends that § 52-178 mandates that the trial court permit leading questions during the direct examination of an adverse witness in every instance. Indeed, the plaintiff does not argue that the court abused its discretion by making an erroneous evidentiary ruling, but rather that the court had no discretion to make such a ruling. The plaintiff frames this as a question of statutory interpretation, relying in part on the legislative history of § 52-178 and on the commentary to the Connecticut Code of Evidence § 6-8, as well as related case law. To claim now, for the first time on appeal, that the trial court "contravened" § 52-178 amounts to an ambuscade of that court. There was neither occasion nor opportunity for the court to consider the statute upon which the plaintiff now relies because the plaintiff did not mention it at any time during the trial. See Practice Book § 60-

5; see also *White* v. *Mazda Motors of America, Inc.*, supra, 313 Conn. 639 (*Eveleigh, J.*, dissenting) ("the essence of the preservation requirement is that fair notice be given to the trial court of the party's view of the governing law" [emphasis omitted; internal quotation marks omitted]). For these reasons, we conclude that the plaintiff's claim was not preserved and decline to review it.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff also named Attorney Eric P. Daigle as a defendant, alleging tortious interference with a contract and civil conspiracy. The claims against Daigle were withdrawn; he is not party to this appeal.

[2] General Statutes § 52-178 provides: "A party to a civil action or probate proceeding: (1) May compel any adverse party, any person for whose benefit the action or proceeding is instituted, prosecuted or defended, or any officer, director, managing agent, or other agent or employee having knowledge of facts relevant to the action or proceeding, of a public or private corporation, partnership or association which is an adverse party or for whose benefit the action or proceeding is instituted, prosecuted or defended, to testify as a witness in his behalf, in the same manner and subject to the same rules as other witnesses; (2) may take the deposition of such party or person in the same manner and subject to the same rules as those pertaining to the taking of other depositions; and, (3) in either case, may examine such party to the same extent as an adverse witness."

[3] At trial, two attorneys appeared on behalf of the plaintiff. For the sake of convenience, we refer to both of them as "the plaintiff's counsel."

[4] McKenna later testified that he had personally seen the plaintiff order "a Jack Daniels on the rocks" while wearing a badge and sidearm.

[5] "[The Plaintiff's Counsel]: Your Honor, at this time I'd like permission to lead the witness given that she was the Personnel Director at the time.
"The Court: Objection?
"[The City's Counsel]: There is; I don't believe it's a hostile witness, I don't believe there's any indication she needs to be led.
"The Court: Granted.
"[The Plaintiff's Counsel]: Thank you."

[6] With respect to Giuliano, the following exchange occurred:
"[The Plaintiff's Counsel]: Your Honor, I request permission to lead the witness.
"The Court: Denied.
"[The Plaintiff's Counsel]: Excuse me?
"The Court: Denied.
"[The Plaintiff's Counsel]: Thank you.
"The Court: That hardly is a foundation; I see nothing but openness and lack of hostility. I'm aware of Mayor Giuliano's role in this; I have been paying a moderate amount of attention during the trial. So, let's proceed.
"[The Plaintiff's Counsel]: Very good, Your Honor."
The court also denied the request of the plaintiff's counsel to ask leading questions of Drew:
"[The Plaintiff's Counsel]: Your Honor, at this time I'd like permission to treat the witness as a party opponent, an adverse witness, and lead?
"The Court: No, it helps me as the trier of fact not to hear leading questions. If you're having difficulty, then I'll grant you the permission; I don't see any indication that the witness is not going to respond fully and fairly to your nonleading questions, and it is an aid to me as the fact finder. So, for the moment the motion is denied with leave to renew if you're perceiving that the only way you can perform your task is with leading.
"[The Plaintiff's Counsel]: Understood, Your Honor. Thank you."
Finally, the court denied the plaintiff's request to ask leading questions of McKenna:
"[The Plaintiff's Counsel]: Your Honor, I would request permission to use leading questions—
"The Court: Let's see how it goes, denied; let's see how it goes.
"[The Plaintiff's Counsel]: All right, okay.
"The Court: If you're getting what appear to me to be open and complete answers without leading questions, as I told your co-counsel, I vastly prefer it as the trier of fact because it helps me to assess credibility much better.

"[The Plaintiff's Counsel]: Okay.

"The Court: If, however, you perceive, and I agree, that the witness is indeed hostile, I will be happy to reconsider my denial of your request for leading questions.

"[The Plaintiff's Counsel]: Okay."

[7] The court expressly declined to decide whether the plaintiff had been "in uniform."

[8] In his reply brief, the plaintiff also suggests, for the first time, two alternative grounds for review of this nonconstitutional claim. First, he contends that this court may consider an unpreserved claim where it is "in the interest of public welfare or of justice between the parties." (Emphasis omitted.) See *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 500, 43 A.3d 69 (2012). We conclude that this claim is inadequately briefed and, thus, abandoned. See *Electrical Contractors, Inc.* v. *Dept. of Education*, 303 Conn. 402, 444 n.40, 35 A.3d 188 (2012) ("Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when they are raised for the first time in a reply brief . . . or consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . ." [Citations omitted; internal quotation marks omitted.]).

Second, in a footnote, the plaintiff argues that plain error review may be appropriate—a claim repeated at oral argument before this court. See Practice Book § 60-5. "It is well established that the plain error doctrine . . . is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that . . . requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . .

"[An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *Estela* v. *Bristol Hospital, Inc.*, 179 Conn. App. 196, 199–200 n.2,      A.3d      (2018). After a careful reading of the record, we are not convinced that the claimed error is so clear that it is "[discernible] on the face of a factually adequate record" or "obvious in the sense of not debatable." (Internal quotation marks omitted.) Id., 200 n.2. Moreover, because the plaintiff's counsel made no showing that the preclusion of leading questions harmed the plaintiff in any way, we are not convinced that the claimed error was "so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) Id. Accordingly, we decline to reverse the judgment under the plain error doctrine.

[9] Conversely, in addition to permitting the plaintiff's counsel to ask leading questions of Milardo; see footnote 6 of this opinion; the court at least twice overruled objections from the city's counsel to leading questions.

[10] Additionally, the record reveals that, on at least one occasion, the court contemplated whether to reassess its ruling sua sponte, noting that it was "inclined to start permitting [leading questions]" during the examination of Drew.